## FIVE PER CENT. CASES.

### IOWA *v.* McFARLAND, Commissioner.

### ILLINOIS *v.* McFARLAND, Commissioner.

ORIGINAL.

Argued November 1st, and 2d, 1883.—Decided March 3d, 1884.

*Military Land Warrants—Five per cent. Act.*

Under the act of March 3d, 1845, ch. 76, relating to the admission of Iowa into the Union, or the act of April 18th, 1818, ch. 67, for the admission of the State of Illinois into the Union, by which "five per cent. of the net proceeds" of public lands lying within the State, and afterwards "sold by Congress," shall be reserved and appropriated for certain public uses of the State, the State is not entitled to a percentage on the value of lands disposed of by the United States in satisfaction of military land warrants.

These were petitions filed in this court by each of the States of Iowa and Illinois, at the relation of its governor, relying upon the provision of an act of Congress relating to its admission into the Union, by which it was agreed that "five per cent. of the net proceeds" of lands lying within the State, and afterwards "sold by Congress," should be appropriated for certain public uses of the State; contending that the State was thereby entitled to five per cent. of the value, computed at the rate of one dollar and twenty-five cents per acre, of lands disposed of by Congress in satisfaction of military land warrants; and praying for a writ of mandamus to the Commissioner of the General Land Office, to compel him, in accordance with section 456 of the Revised Statutes, to state an account between the United States and the State, for the purpose of ascertaining the sum of money so due to the State, and to transmit the account to the Comptroller of the Treasury for his examination and action, to the end that that sum might be allowed and paid by the United States.

The provisions of the acts of Congress, on which the petitioners relied were as follows:

The sixth section of the act of Congress of March 3d, 1845,

ch. 76, supplemental to the act of the same day by which the State of Iowa was admitted into the Union, contained, among the propositions offered to the legislature of the State for its acceptance or rejection, and which, if accepted under the authority conferred on the legislature by the convention which framed the Constitution of the State, should be obligatory upon the United States, the following: ·

" Fifth. That· five per cent. of the net proceeds of sales of all public lands lying within the said State, which have been or shall be sold by Congress from and after the admission of said State, after deducting all the expenses incident to the same, shall be appropriated for making public roads and canals within the said State, as the legislature may direct: *Provided*, That the five foregoing propositions herein offered are on the condition that the legislature of the said State, by virtue of the powers conferred upon it by the convention which framed the Constitution of the said State, shall provide, by an ordinance, irrevocable without the consent of the United States, that the said State shall never interfere with the primary disposal of the soil within the same by the United States, nor with any ·regulations Congress may find necessary for securing the title in such soil to the *bona·* *fide* purchasers thereof; and that no tax shall be imposed on lands the property of the United States; and that in no case shall non-resident proprietors be taxed higher than residents; and that the bounty lands granted, or hereafter to be granted, for military services during the late war, shall, while they continue to be held by the patentees or their heirs, remain exempt .from any tax laid by order or under the authority of the State, whether for State, county, township, or any other purpose, for the term of three years from and after the date of the patents, respectively." 5 Stat. 790.

The sixth section of the act of Congress of April 18th, 1818, ch. 67, to enable the people of the Illinois Territory to form a Constitution and State government, and for the admission of the State of Illinois into the Union, contained among the propositions offered to the convention of the Territory, and which, if accepted by the convention, should be obligatory upon the United States, the following:

Statement of Facts.

"Third. That five per cent. of the net proceeds of the lands lying within such State, and which shall be sold by Congress from and after the first day of January, one thousand eight hundred and nineteen, after deducting all expenses incident to the same, shall be reserved for the purposes following, viz.: two-fifths to be disbursed, under the direction of Congress, in making roads leading to the State; the residue to be appropriated, by the legislature of the State, for the encouragement of learning, of which one-sixth part shall be exclusively bestowed on a college or university:" "*Provided always*, That the four foregoing propositions, herein offered, are on the conditions that the convention of the said State shall provide, by an ordinance, irrevocable without the consent of the United States, that every and each tract of land sold by the United States, from and after the first day of January, one thousand eight hundred and nineteen, shall remain exempt from any tax laid by order or under any authority of the State, whether for State, county or township, or any other purpose whatever, for the term of five years from and after the day of sale. *And further*, That the bounty lands granted, or hereafter to be granted, for military services during the late war, shall, while they continue to be held by the patentees or their heirs, remain exempt, as aforesaid, from all taxes, for the term of three years from and after the date of the patents respectively ; and that all the lands belonging to citizens of the United States, residing without the said State, shall never be taxed higher than lands belonging to persons residing therein."     3 Stat. 430, 431.

By the act of Congress of March 2d, 1855, ch. 139, entitled : "An Act to settle certain accounts between the United States and the State of Alabama," it was enacted as follows :

"That the commissioner of the general land office be, and he is hereby, required to state an account between the United States and the State of Alabama, for the purpose of ascertaining what sum or sums of money are due to said State, heretofore unsettled, under the sixth section of the act of March second, eighteen hundred and nineteen, for the admission of Alabama into the Union ; and that he be required to include in said account the several reservations under the various treaties with the Chickasaw, Choctaw, and Creek Indians within the limits of Alabama, and allow

and pay to said State five per centum thereon, as in case of other sales." 10 Stat. 630.

By the act of June 3d, 1857, ch. 104, entitled "An Act to settle certain accounts between the United States and the State of Mississippi and other States," it was enacted as follows:

"SECT. 1. That the commissioner of the general land office be, and he is hereby, required to state an account between the United States and the State of Mississippi for the purpose of ascertaining what sum or sums of money are due to said State, heretofore unsettled, on account of the public lands in said State, and upon the same principle of allowance and settlement as prescribed in the 'Act to settle certain accounts between the United States and the State of Alabama,' approved the second of March, eighteen hundred and fifty-five; and that he be required to include in said account the several reservations under the various treaties with the Chickasaw and Choctaw Indians within the limits of Mississippi, and allow and pay to the said State five per centum thereon, as in case of other sales, estimating the lands at the value of one dollar and twenty-five cents per acre.

"SECT. 2. That the said commissioner shall also state an account between the United States and each of the other States upon the same principles, and shall allow and pay to each State such amount as shall thus be found due, estimating all lands and permanent reservations at one dollar and twenty-five cents per acre." 11 Stat. 200.

Each petition alleged that the State had accepted the propositions and faithfully kept and performed on its part the conditions set forth in the act of admission; that, prior to the dates of the passage of the acts of 1855 and 1857 respectively, the five per cent. on the cash sales of the public lands lying within the States of Alabama and Mississippi had been regularly and periodically paid to those States respectively, so that at those dates there were no unsettled accounts, growing out of the five per cent. clause of the acts for the admission of those States into the Union, except for lands entered and purchased with military land warrants; and that by the act of 1857 it was the duty of the Commissioner of the General Land Office,

when required to do so, to state an account between the United States and each State upon the same principles of allowance as prescribed in the act of 1855, and by that act it was his duty, upon proper application, to state such an account for the purpose of ascertaining what sum or sums of money, theretofore unsettled under the act for the admission of the State into the Union, were due to it on account of lands lying within the State, disposed of by the United States for, or in the satisfaction and redemption of, military land warrants issued by the United States for military services.

Each petition further alleged that the government of the United States, in disposing of the public lands by sale in this and other western States, adopted two methods, one for cash, the other for the redemption of its outstanding military warrants or obligations, calling for a specific quantity of land, issued to the soldiers who had enlisted and served in the different wars of the country, under statutes enacted in advance of their enlistments, and as a compensation for their military services.

Each petition suggested that by the act of August 14th, 1848, ch. 180, 9 Stat. 332, military land warrants were made receivable, at the rate of $1.25 per acre for the number of acres therein contained, in payment for any of the public lands subject to private entry; and that by the act of March 22d, 1852, ch. 19, 10 Stat. 3, all military land warrants, theretofore and thereafter issued, were made assignable by the persons to whom they were issued, and also made receivable from their assignees, at the rate aforesaid per acre, in payment for any of the public lands located and taken up under the pre-emption laws of the United States.

Each petition further alleged that the five per cent. had been allowed and paid to the petitioner, at stated and proper periods, on sales for cash, but had been withheld on lands located and purchased with military land warrants; that the sum so withheld amounted to $881,006.60 in the case of Iowa, and $595,-853.31 in the case of Illinois; that the respondent, though formally requested, had refused to state an account as prayed for; and that the duty of stating such an account was purely

ministerial and mandatory in its character, leaving no room for the exercise of his own judgment and discretion in its performance.

Upon each of these petitions a rule to show cause was granted at the last term. The Commissioner of the General Land Office at this term filed an answer, in the nature of a return to each rule, admitting that upon the facts stated in the petition, as modified and explained by the facts set forth below, he refused to state the account prayed for, and alleging that the grounds of his refusal were these :

First. That neither the act of Congress relating to the admission of the State into the Union, nor the acts of 1855 and 1857, authorized the State to claim a percentage upon public lands disposed of by the United States to the holders of bounty land warrants.

Second. That the meaning of those statutes had been established, as between the parties, by the contemporaneous and continuous construction thereof by the General Land Office and the State in numerous and important transactions, each of which suggested a question, if one existed, as to their construction.

In the case of the State of Iowa, the answer alleged that between August, 1848, and July, 1858, eleven different settlements had been made in the General Land Office for the percentage due to the State, covering in all the sum of $580,-710.49, in none of which was the present claim suggested, although from time to time during that period large amounts of the public lands lying within the State had been disposed of by the United States to the holders of such warrants ; that this contemporaneous practical construction had governed all transactions with the nineteen States interested in the statutory provision under consideration ; that on September 7th, 1858, the State of Iowa made a formal demand upon the Secretary of the Interior as the official superior of the then Commissioner of the General Land Office, to be allowed the percentage now claimed ; and that its demand was refused, for the reason stated by the Secretary in the following letter to the Governor of Iowa:

Statement of Facts.

"Department of the Interior, September 20th, 1858.

"In reply to your letter of the 7th instant, in relation to the application for an allowance of five per centum, claimed to be due the State of Iowa on military land warrant locations, I have the honor to state that, in my opinion, the act of 1847, to which you refer, is a bounty land act, and that no distinction can properly be made between locations made under it and those made under other bounty land laws. The location of warrants issued under the act of 1847 is not considered as constituting a sale of the public lands, as contemplated by the act admitting Iowa into the Union. That act appropriated five per cent. of the net proceeds of sales of all public lands for. making public roads and canals within the State. There being no net proceeds accruing from locations by military land warrants, the allowance of five per centum on such locations cannot be regarded as having been appropriated or provided for by law.

"J. Thompson, Secretary.

"Governor R. P. Lowe, Iowa.

The answer in the case of the State of Iowa further alleged that this was the only demand ever made by the State of Iowa, or by any other State, upon the Secretary of the Interior or upon the Commissioner of the General Land Office, in accordance with the claim now set up; and that the State of Iowa had ever since practically acquiesced in the construction suggested by the Secretary of the Interior, and had confined its efforts to applications to Congress for a change in the statutes.

In the case of the State of Illinois, the answer alleged that from November, 1830, to September, 1863, thirty-three different settlements had been made, covering in all the sum of $711,744.82, and of which that made in 1863, for $1,565.80, was for Indian reservations only, in none of which was the present claim suggested, although from time to time during fifteen or more years of that period large amounts of the public lands lying within the State were disposed of by the United States to holders of bounty land warrants.

Each answer concluded by denying that the petitioner, in any view of the case, was entitled to a writ of mandamus.

*Mr. Allen G. Thurman, Mr. William M. Evarts, Mr. Samuel Shallabarger, Mr. R. P. Lowe* and *Mr. W. W. Wiltshire* for petitioners.

*Mr. M. L. Woods* on behalf of the State of Alabama, also by leave of court filed a brief for the petition.

*Mr. Solicitor-General* opposing.

MR. JUSTICE GRAY delivered the opinion of the court. After stating the facts in the foregoing language, he continued:

The first question argued in each of these cases may be shortly stated thus: Is the State, under the compact made with it by Congress at the time of its admission into the Union, by which "five per cent. of the net proceeds" of public lands lying within the State, and "sold by Congress" after such admission, shall be reserved and appropriated for the benefit of the State, entitled to a percentage on the value of lands, not sold by the United States for cash, but disposed of by the United States in satisfaction of military land warrants?

This question is rendered important by the large sums of money involved, and by the fact that similar stipulations are contained in acts passed by Congress relating to seventeen other western or southern States, beginning with § 7 of the act of April 30th, 1802, ch. 40, for the admission of the State of Ohio into the Union. 2 Stat. 175.

Upon full consideration of the question, with the aid of the able arguments of counsel, the court is of opinion that lands disposed of by the United States in satisfaction of military land warrants are not sold, within the meaning of the statutes upon which the petitioners rely.

A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent. When property or money is transferred or paid as a compensation for service, the property or money may be said to be the price of the service; but it can hardly be said that the service is the price of the property or money, or that the property or money is sold to the person performing the service. Nor can it be said that the pay of an officer or soldier in the army or navy is

sold to him by the government in consideration of a price paid by him.

Land or money, other than current salary or pay, granted by the government to a person entering the military or naval service of the country, has always been called a bounty; and while it is by no means a gratuity, because the promise to grant it is one of the considerations for which the soldier or sailor enters the service, yet it is clearly distinguishable from salary or pay measured by the time of service. For example, it was held by Lord Mansfield and the Court of King's Bench in 1784, that though the master of an apprentice was entitled by the act of Parliament of 2 & 3 Anne, ch. 6, § 17, to the wages of his apprentice enlisting into the navy, yet the apprentice's share of prize money belonged to himself, and not to his master, because it was not wages, but the bounty of the crown. *Carsan* v. *Watts*, 3 Doug. 350; *Eades* v. *Vandeput*, 4 Doug. 1. Upon like grounds, it has been held that bounty money paid by the United States, or by a State, city or town, upon the enlistment of a minor as a soldier, during the recent war, belonged to him, and not to his father or master. *Banks* v. *Conant*, 14 Allen, 497; *Kelly* v. *Sprout*, 97 Mass. 169. See also *Alexander* v. *Wellington*, 2 Russ. & Myl. 35, 56, 64.

The learned counsel for the State of Iowa referred to General Washington's Circular Letter of June 8th, 1783, to the governors of the States, and especially to the passage in which he insisted that the half pay and commutation promised by the Congress of the Confederation to the officers of the army, during the war of the Revolution, "should be viewed, as it really was, a reasonable compensation offered by Congress, at a time when they had nothing else to give, to the officers of the army for services, then to be performed; it was the only means to prevent a total dereliction of the service; it was a part of their hire; I may be allowed to say, it was the price of their blood and of your independency; it is therefore more than a common debt; it is a debt of honor; it can never be considered as a pension or gratuity, nor be cancelled until it is fairly discharged." But in the very next paragraph he spoke of "the bounties many of the soldiers have received," "besides the donation of lands."

The question before us is not whether the promise by the government of a bounty in land or money to persons entering the military service is a contract for valuable consideration; but whether, when carried into effect, it constitutes a sale by the government; and it is quite clear that land granted by way of reward for military services has never been treated, in the legislation of the United States upon the subject, as sold, but has always been considered as analogous to money paid in a gross sum by way of bounty.

By the resolution of September 16th, 1776, the Congress of the Confederation resolved that " twenty dollars be given as a bounty " to each non-commissioned officer and private soldier enlisting to serve during the war, and that " Congress make provision for granting lands " to officers and soldiers in certain proportions; " such lands to be provided by the United States," and any necessary expenses in procuring them to be paid and borne by the United States in the same proportion as the other expenses of the war. 2 Journals of Congress, 357.

The act of Virginia of December 20th, 1783, to cede the Northwest Territory to the United States, and the deed of cession of March 1st, 1784, were upon the following conditions: That the Territory so ceded should be laid out and formed into States, to be admitted members of the Federal Union. That,

" A quantity, not exceeding one hundred and fifty thousand acres of land, promised by this State, shall be allowed and granted " to General George Rogers Clarke and his officers and soldiers. " That in case the quantity of good lands on the southeast side of the Ohio, upon the waters of Cumberland River, and between the Green River and Tennessee River, which have been reserved by law for the Virginia troops upon Continental establishment, should, from the North Carolina line bearing in further upon the Cumberland lands than was expected, prove insufficient for their legal bounties, the deficiency should be made up to the said troops in good lands, to be laid off between the rivers Scioto and Little Miami, on the northwest side of the river Ohio, in such proportions as have been engaged to them by the laws of Virginia. That all the lands within the territory so ceded to the United States, and not reserved for or appropriated to any of the before mentioned

purposes, or disposed of in bounties to the officers and soldiers of the American army, shall be considered as a common fund for the use and benefit of such of the United States as have become or shall become members of the confederation or federal alliance of the said States." 1 Constitutions and Charters, 427, 428.

The acts of Congress under the Constitution, containing grants of land or money to soldiers, have habitually and repeatedly spoken of them as bounties, using the words "bounty of three months' pay and one hundred and sixty acres of land;" "military bounty lands;" "military land bounties;" "bounty in money and land;" "money bounty;" "bounty of one hundred and sixty acres of land;" "bounty in land;" "bounty right;" "bounty land;" and "military land bounty." Acts of December 24th, 1811, ch. 10, § 2; January 11th, 1812, ch. 14, § 12; May 6th, 1812, ch. 77; December 12th, 1812, ch. 4, § 3; 2 Stat. 669, 673, 729, 788; January 28th, 1814, ch. 9, § 2; February 10th, 1814, ch. 11, § 4; December 10th, 1814, ch. 10, §§ 3–5; 3 Stat. 96, 97, 147; February 11th, 1847, ch. 8, § 9; September 28th, 1850, ch. 85; 9 Stat. 125, 520. See also *French* v. *Spencer*, 21 How. 228; *Maxwell* v. *Moore*, 22 How. 185. They have never spoken of such grants of lands as sales, or of the lands granted as sold.

The very provisions of the acts for the admission of the States of Illinois and Iowa into the Union, which are the foundation of the claims now urged, clearly mark the distinction between lands sold for money, and bounty lands granted for military services.

In the Illinois act, the agreement on the part of the United States is that "five per cent. of the net proceeds of the lands lying within such State, and which shall be sold by Congress," "shall be reserved," part "to be disbursed," under the direction of Congress, in making roads leading to the State, and the rest "to be appropriated," by the legislature of the State, for the encouragement of learning. And among the conditions to be performed on the part of the State are: First. "That every and each tract of land sold by the United States" shall remain exempt from all State taxation for "five years from and after

the day of sale." Second. "That the bounty lands granted, or hereafter to be granted, for military services during the late war, shall, while they continue to be held by the patentees or their heirs," be exempt from State taxation for " three years from and after the date of the patents respectively." To hold that " lands sold by Congress " included " bounty lands granted for military services " would make these two conditions contradictory of each other; for " every and each tract of land sold by the United States" was to be absolutely exempt from State taxation for five years, whereas military bounty lands were to be exempt only while held by the patentees or their heirs, and not exceeding three years.

The Iowa act manifests the same distinction; for, while it omits the provision exempting "lands sold by the United States " from State taxation, it retains the provision exempting from taxation " bounty lands granted for military services ; " and it emphasizes the meaning of the leading clause of the proposition, by inserting therein the words " of sales," so as to read "five per cent. of the net proceeds of sales of all public lands, lying with the said State, which have been or shall be sold by Congress from and after the admission of said State, after deducting all the expenses incident to the same, shall be appropriated for making public roads and canals within the said State, as the legislature may direct."

When each of these acts speaks of lands "sold by Congress," " five per cent. of the net proceeds " of which shall be reserved, and be " disbursed" or " appropriated" for the benefit of the State in which the land lies, it evidently has in view sales in the ordinary sense, from which the United States receive proceeds, in the shape of money payable into the treasury, out of which the five per cent. may be reserved and paid to the State; and does not intend to include lands promised and granted by the United States as a reward for military service, for which nothing is received into the treasury. The question depends upon the terms in which the compact between the United States and each State is expressed, and not upon any supposed equity extending those terms to cases not fairly embraced within their meaning.

From the very beginning of our existence as a nation, the reward of military service has been treated as a national object and a public use, to which the national domain might justly and lawfully be applied. As new States have been successively formed out of the territory of the United States, and admitted into the Union, the acts of admission have reserved, for the making of public highways and other public uses of the State, a twentieth part of the net proceeds of public lands lying within the State, and afterwards sold by the United States. But public lands taken up on military land warrants issued under general laws, passed for the national object of encouraging and rewarding military service, and not limited to any particular State, have no more been regarded as lands sold, for any portion of the value of which the national government should account to the State in which the lands are actually taken up, than lands reserved and used for forts, arsenals or light-houses. Some reliance is placed by the petitioners upon the acts of Congress of August 14th, 1848, ch. 180, and March 22d, 1852, ch. 19, by which military land warrants are made assignable, and are also made receivable, either from the original grantee or from his assignee, in payment for public lands, at the rate of one dollar and twenty-five cents per acre. But the promise of the United States is made to the soldier at the time of his entering the service, and the grant, in execution of that promise, is made when the warrant is issued to him, and in consideration of services then already performed. At that time, no particular land is transferred to him, nor even the State designated in which the land shall be. The selection of the land, which first determines the State where it is to be taken up, is the act, not of the government, but of the holder of the warrant. The government receives no new consideration, and makes no new promise or grant, when the warrant is assigned by the soldier, or when it is actually located by himself or his assignee, and the land and the State in which it lies thereby for the first time designated; and never, at any stage of the transaction, receives into the treasury any money from any person.

The fact that the registers and receivers of the land office, performing services in locating military bounty land warrants,

are authorized by § 2 of the act of 1852 to demand and receive
for their services, from the assignees or holders of such war-
rants, the same compensation " to which they are entitled by
law for sales of the public lands for cash, at the rate of one
dollar and twenty-five cents per acre," has no tendency to show
that the United States, under their agreement to pay to the
State five per cent. of the net proceeds of lands sold by Con-
gress, are bound to pay five per cent. on the value of lands
which they have never sold, and for which they have received
no money.

The acts of March 2d, 1855, ch. 139, and March 3d, 1857,
ch. 104, requiring five per cent. to be paid to the States on the
value of lands included in reservations under treaties with
Indian tribes, had reference only to lands reserved to the
Indians by stipulations in such treaties. The fact that the
words " as in case of other sales " are used in speaking of lands
reserved for that purpose, and have never been so applied to
lands disposed of in satisfaction of military land warrants,
appears to us, so far as it has any bearing, to imply an inten-
tion to exclude the latter from the class of lands sold, rather
than to include them in this class.

That class of decisions of which *United States* v. *Watkins*, 97
U. S. 219, is an example, in which, under an act of Congress,
providing that in case lands within territory ceded to the
United States, claimed under grants previously made by foreign
governments and since confirmed, should be sold by the United
States before the confirmation, or could not be surveyed and
located, the claimant should be entitled to so much public land
in lieu thereof, it was held that lands granted by the United
States to settlers thereon were included, rests upon the reasons
that the claimant had been deprived of so much of his private
property by the act of the United States, and that the statutes
*in pari materia* used the words " sold or disposed of." Neither
of those reasons is applicable to the cases before us.

The conclusion to which the court is brought, upon a con-
sideration of the language of the statutes relied on, and of the
nature of the subjects to which they refer, accords with the
contemporaneous and uniform construction given to them by

the executive officers charged with the duty of putting them in force. If the court had a doubt of the true meaning of their provisions, this practical construction would be entitled to great weight. *Edwards* v. *Darby*, 12 Wheat. 206; *United States* v. *State Bank of North Carolina*, 6 Pet. 29; *United States* v. *McDaniel*, 7 Pet. 1; *Surgett* v. *Lapice*, 8 How. 48; *Smythe* v. *Fiske*, 23 Wall. 374; *United States* v. *Moore*, 95 U. S. 760; *United States* v. *Pugh*, 99 U. S. 265; *Swift Co.* v. *United States*, 105 U. S. 691, 695.

The petitioners failing to prove any lawful claim against the United States, it becomes unnecessary to determine the further question, discussed at the bar, whether the writ of mandamus is an appropriate remedy in such cases.

*Petitions dismissed.*

Mr. Justice Miller, with whom concurred Mr. Justice Field, dissenting.

I do not concur in the judgment of the court in this case, if that can be called a judgment in which the court, declining to consider the question of its jurisdiction, decides that if it had jurisdiction the petitioners make no case for relief.

I doubt very much whether this court has jurisdiction in a suit by a State to establish an obligation of the United States to pay to the State a sum of money, by compelling one of the auditing officers of the United States to state an account under the direction of the court according to a rule which the court may prescribe to him.

I discuss this matter no further, but to observe that if the court has no such jurisdiction its opinion is of no value beyond the force of its argument and the weight of character of the judges who concur in it.

The opinion concedes that the acts of Congress under which the States of Illinois and Iowa were admitted into the Union, and the acceptance of their provisions, are compacts. If any less sanctity is due to these provisions by calling the matter a compact instead of a contract it is not perceptible to me. It is not denied that the State and the United States were capable of contracting. It is not denied in the opinion that they *did*

contract. Taking the case of the State of Iowa, the sixth section of the act for her admission, 5 Statutes, 789, says that, in lieu of the propositions submitted to Congress by the convention of the Territory, which are rejected, the following propositions are hereby offered to the legislature of the State of Iowa, which, if accepted, shall be obligatory on the United States. They were accepted. The propositions were the result of a negotiation, of items accepted and others rejected in that negotiation. It was a fair bargain between competent parties. The fifth item of this contract is as follows:

" *Fifth.* That five per cent. of the net proceeds of sales of all public lands lying within the said State, which have been or shall be sold by Congress, from and after the admission of said State, after deducting all the expenses incident to the same, shall be appropriated for making public roads and canals within the said State, as the legislature may direct : *Provided,* That the five foregoing propositions herein offered are on the condition that the legislature of the said State, by virtue of the powers conferred upon it by the convention which framed the Constitution of the said State, shall provide by an ordinance, irrevocable without the consent of the United States, that the said State shall never interfere with the primary disposal of the soil within the same by the United States, nor with any regulations Congress may find necessary for securing the title in such soil to the *bona fide* purchasers thereof; and that no tax shall be imposed on lands the property of the United States, and in no case shall non-resident proprietors be taxed higher than residents; and that the bounty lands granted or hereafter to be granted for military services during the late war shall, while they continue to be held by the patentees or their heirs, remain exempt from any tax laid by order or under the authority of the State, whether for the State, county, or township, or any other purpose, for the term of three years from and after the dates of the patents respectively.

"Approved March 3d, 1845."

The legal expression of this contract is that the State of Iowa has the right to tax all the lands of the government as soon as the government sells them. She may have other rights with regard to the disposal of these lands by the United

States, as, for instance, in regard to title to aliens or corporations in perpetuity unacceptable to the State.

Now, in consideration that she agrees to make no interference with the primary disposal of the soil or any regulations of Congress for that purpose, that she will tax no non-resident in regard to said lands higher than she does residents, that she will impose no tax on the property of the United States, and no tax on lands granted for military services for three years after the dates of the patents, either for State, county or township purposes, there shall be paid to the State five per cent. of the net proceeds of sales of all public lands lying within the State which have been or shall be sold by Congress from and after the admission of the State.

The question raised here is whether the word *sales* in this act of Congress is limited to sales made for money, or whether lands used in payment for the services of her military and naval officers and soldiers are sold within the meaning of the statute.

It seems probable that a false impression has been made by calling these latter bounties; and it is true that in some cases where, *after* the service has been rendered, Congress has granted lands as gratuity to the soldier or sailor, it is a bounty, and is not a sale in fact, or within the meaning of the statute. But the large body of these land warrants were issued under statutes, which, in calling the men into service and prescribing their compensation in advance, declared that for so many months' service they should, in addition to their monthly cash payment, receive so many acres of land, according to the length of their service.

This was as much a part of the pay which the government agreed to make for his services as the cash payment. And to show that the government so considered it, a reference to the acts of 1847, to raise troops for the Mexican war, under which the largest part of the sales in Iowa was made, is all that is necessary.

The 9th section of that act, 9 Stat. 125, authorizes the soldier to receive, at his option, a land warrant for one hundred and sixty acres, to be located on any public lands, or

treasury scrip for $100 ; such scrip to be redeemable at the pleasure of the government, and to bear interest at six per cent. per annum until paid.

It was also enacted that those land warrants should be received at the land office in payment of any congressional subdivision of the public land, at the rate of $1.25 per acre, the purchaser paying any balance above the value of the land warrant in cash.   9 Stat. 332.

And still later, it was enacted that a person having a pre-emption right to a tract of land should be entitled to use any such land warrant in payment of the same, at the rate of $1.25 per acre.

That they might be thus freely used in the purchase of the public lands, these warrants were by statute early made assignable, and it may be safely said that for years the largest part of the public lands sold by the land officers were paid for by these land warrants.

Blackstone defines a sale to be " a transmutation of property from one man to another in consideration of some price." 2 Blackstone, 446.   And Kent says " a sale is a contract for the transfer of property from one person to another for valuable consideration, and three things are requisite to its validity, viz. : the thing sold, which is the object of the contract, the price, and the consent of the contracting parties." 2 Kent, 468. And though there is some controversy whether, in reference to personal property, the consideration is not to be paid in money, the use of the old phrase " bargain and sale" in regard to land, never required that the consideration should be exclusively a money payment.   2 Bouvier's Law Dictionary, 494, clause 6, Sale.

But it surely was never contemplated in this compact between a State of the Union and the general government that if the government could dispose of her public lands, and secure their full price in other valuable consideration than money, the State should thus be cheated out of the five per cent. of that value which she had a right to expect.

The United States made these warrants the equivalent of money in purchase of these lands by the holders.   They gave

them the equivalent purchasing power of money and the quality of negotiability, and they gave the soldier the option of a treasury draft or a land warrant when he had rendered the service.

It is the merest quibble to say that where a man purchased a quarter-section of the public lands with one of these warrants, the government had not sold him that land at a dollar and a quarter an acre.

No importance can be attached to the previous construction of the government. The amount in controversy attracted no attention until the location of the land warrants for service in the Mexican war, and the lands in the Territories were not subject to this five per cent. As early as 1858, when the locations under the Mexican war claims were thickest, Governor Lowe of Iowa asserted this right in a letter to Mr. Thompson, Secretary of the Interior. This was immediately after the act of 1857, making it the duty of the land commissioner to state these accounts. The claim has been urged by that State ever since, except during the disastrous period of the civil war; and the Senate of the United States passed a law recognizing the justice of the claim and that of other States, and ordering their payment, during the last Congress, but, on a motion to reconsider, it was tied up and has not been acted on since.

I entertain no doubt of the legal as well as the moral obligation of the United States to pay to the States concerned the five per cent. on these sales which they have thus far withheld.

Mr. Justice Field concurs with me in this opinion.