**NEPHI PROCESSING PLANT, Inc.,
a corporation, Appellant,**

v.

**WESTERN COOPERATIVE HATCH-
ERIES, a corporation, Appellee.**

No. 5352.

United States Court of Appeals
Tenth Circuit.

March 4, 1957.

Rehearing Denied April 30, 1957.

568

John S. Boyden, Salt Lake City, Utah (Bryant H. Croft, Salt Lake City, Utah, was with him on the brief), for appellant.

Arthur H. Nielsen, Salt Lake City, Utah (Dean E. Conder, Salt Lake City, Utah, was with him on the brief), for appellee.

Before BRATTON, Chief Judge, and HUXMAN and PICKETT, Circuit Judges.

BRATTON, Chief Judge.

This was an action instituted in the United States Court for Utah by Western Cooperative Hatcheries against Nephi Processing Plant, Inc.; and for convenience, reference will be made to the parties as Hatcheries and Processing, respectively. Hatcheries was a corporation organized under the laws of Washington; Processing was a corporation organized under the laws of Utah; and jurisdiction was predicated upon diversity of citizenship with the requisite amount in controversy.

The complaint was in three counts. The first count was upon a promissory note. The second count was to recover for turkey poults delivered to Processing pursuant to the terms of a written agreement. It was alleged among other things that by the agreement, Processing was obligated to pay one-half of the price of such poults within thirty days after the delivery thereof and was to deliver to Hatcheries notes and mortgages from the growers of the turkeys for the balance; and that Processing failed to comply with such obligation. And the third count was to recover for poults delivered to Processing but not covered by the written agreement. By answer, Processing admitted the execution and nonpayment of the note but alleged that the amount thereof was offset by a greater sum owed to Processing as alleged in the counterclaim subsequently pleaded. Processing admitted the execution of the written agreement and the delivery of the poults but pleaded in substance that when the poults began to arrive it was determined that they were infected with a chronic respiratory disease commonly called infectious sinusitis; that Processing immediately directed that no further poults infected with such disease be shipped; that notwithstanding such direction, Hatcheries continued to ship infected poults; that due to the diseased condition of the poults, Processing was unable to collect from growers who received them one-half of the purchase price or to obtain from such growers notes and mortgages for the remaining one-half of the purchase price; that the parties entered into an oral modification of the written agreement; and that Processing performed its obligations under the agreement as modified. Processing admitted the delivery of poults not covered by the agreement but alleged that the amount due therefor was offset by a greater sum owed to Processing as charged in the counterclaim subsequently pleaded. And Processing pleaded three counterclaims. In the first counterclaim, it sought to recover

reimbursement for expenditures made for medicines used in combatting the disease among the poults, sought to recover for commissions, and sought to recover for loss of profits. The second and third counterclaims were subsequently abandoned. The cause was tried to a jury. The court directed a verdict for Hatcheries on the several counts in the complaint in specified amounts, respectively; and the court further directed a separate verdict against Processing on the several counterclaims. Judgment was entered upon the verdicts, and Processing appealed.

Entertaining the view that the written agreement into which the parties entered was within the statute of frauds either as a contract of sale or an obligation to guarantee the debt of another and therefore could not be modified by a subsequent oral agreement, the court excluded all of the tendered evidence tending to show that after discovery of the infectious disease among the poults, the parties by oral agreement entered into a different arrangement and that Processing performed its obligations under such new arrangement. Section 60–1–1, Utah Code Annotated 1953, provides that a contract to sell goods is a contract whereby the seller agrees to transfer the property to the buyer for a consideration called the price. And section 60–1–4 provides that a contract to sell or a sale of any goods or choses in action of the value of $500 or more shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale is signed by the party to be charged or his agent in that behalf. Hatcheries was a co-operative located at Bellevue, Washington, engaged in the business of supplying large quantities of turkey poults from its hatcheries located in the Northwest. Processing owned and operated a turkey processing plant at

Nephi, Utah, at which it processed turkeys for various growers. The processing consisted of killing, eviscerating, freezing, and shipping the turkeys. The agreement provided among other things that Hatcheries would deliver 450,000 poults to Processing, f.o.b. Salt Lake City, Utah, "for sale to producers". It provided that Processing agreed "to cause the same to be purchased by producers". It provided that Processing agreed "to cause to be paid over to" Hatcheries one-half of the sale price of the poults within thirty days after their arrival in Utah. It provided that Processing should deliver to Hatcheries notes and mortgages regularly executed by producers "who purchase the poults for the balance of the purchase price, said balance to be payable within sixty days after the processing of said turkeys." It provided that Processing should "place all of said turkeys with other growers who have been approved by General Mills, Inc., or other acceptable feed suppliers, as to credit risk; and for those so placed Cooperative will assume the risk and responsibility of payment of such notes and mortgages." It provided that Processing should "cause all turkeys subject to the notes and mortgages executed pursuant to Paragraph 1 hereof to be marketed or sold to or through the Processor, and further agrees to hold the funds from the sale of said turkeys which come into its hands for application upon the mortgages and obligations against said turkeys, brooding supplies, processing and marketing and other encumbrances, and the obligation to the Cooperative." And it provided that in consideration of Processing selling the number of turkeys specified therein, for the services rendered in placing such turkeys, and for the services rendered in aiding Hatcheries in the collecting of the balance of the purchase price, Hatcheries should upon full payment of each lot of turkeys, or within fifteen days thereafter, pay to Processing ten per cent of the purchase price of such turkeys paid to it. Processing contacted growers or producers and obtained from them orders to purchase various quantities of the poults; obtained promissory notes for part of the purchase price of the poults; and obtained chattel mortgages upon the poults as security for the notes. The orders were placed upon an order form which Hatcheries furnished to Processing and they were signed by Richard L. Harmon as "Cooperative representative" and the growers, respectively. Harmon was employed by Processing, and he bore no relationship to Hatcheries except in placing the poults and obtaining the orders, the notes, and the chattel mortgages. After an order was executed in that manner, it was forwarded to Hatcheries. Hatcheries then prepared an "Acceptance of Order Form". The original was sent to the grower, and a so-called "Salesman's Copy" was mailed to Processing. That general pattern of practice was followed by the parties acting under a similar agreement during the preceding year and again in carrying out this agreement.

■■■ The sale of personal property in the usual sense ordinarily means the passing of title and possession for money or other consideration which the buyer pays or promises to pay. Five Per Cent. Cases (State of Iowa v. McFarland), 110 U.S. 471, 478, 4 S.Ct. 210, 28 L.Ed. 198; Pender v. Commissioner, 4 Cir., 110 F.2d 477, certiorari denied, 310 U.S. 650, 60 S.Ct. 1103, 84 L.Ed. 1416; Hawaiian Gas Products v. Commissioner, 9 Cir., 126 F.2d 4, certiorari denied 317 U.S. 653, 63 S.Ct. 48, 87 L.Ed. 525; Jones v. Corbyn, 10 Cir., 186 F.2d 450; Raton Wholesale Liquor Co. v. Besre, 49 N.M. 121, 158 P.2d 295. When the agreement is considered in its entirety against the background attending its execution, and when appropriate consideration is given to the manner in which the poults were placed with the growers, it is apparent that the agreement was not intended to be and was not in effect one of sale of the poults from Hatcheries to Processing. It was an agreement relating to sales of poults from Hatcheries to growers in Utah to whom the poults would be distributed

through Processing in accordance with the provisions of the agreement. Sales of poults from Hatcheries to the growers were contemplated from the outset. Processing was an intermediary in effectuating the sales, but it was not a purchaser of the poults. Accordingly, the agreement was not one of sale within the scope and meaning of sections 60–1–1 and 60–1–4, supra.

Section 25–5–4, Utah Code Annotated 1953, provides in presently material part that every promise to answer for the debt, default, or miscarriage of another shall be void unless such agreement or some note or memorandum thereof is in writing subscribed by the party to be charged therewith. This conventional provision brings within its reach a collateral agreement by which one undertakes to underwrite in some form the liability of the orginal obligor but it has no application to an orginal undertaking of a promisor. And although no comprehensive test has been devised for determining in all cases whether a contract or agreement is a collateral agreement within the statute or an orginal undertaking without the statute, it is generally held that if the predominant purpose of the promisor is to subserve or further his own interest rather than merely to underwrite the debt of another, it is an original undertaking not within the statute of frauds although it may be in form a promise to pay or discharge the debt of another and although its performance may incidentally have the effect of extinguishing the liability of another. Emerson v. Slater, 22 How. 28, 16 L.Ed. 360; Davis v. Patrick, 141 U.S. 479, 12 S.Ct. 58, 35 L.Ed. 826; Kelsey v. Munson, 10 Cir., 198 F. 841; Thomas v. Williams, 173 Okl. 601, 49 P.2d 557; Allen v. Turner, 152 Kan. 590, 106 P.2d 715; Stowell Lumber Co. v. Wyman, 19 Wash. 2d 487, 143 P.2d 457; Tracewell v. Sanborn, 210 Iowa 1324, 232 N.W. 724; State Automobile Insurance Co. v. Wilson, Ky., 280 S.W.2d 537.

Sometimes it is difficult to determine whether the parties to an agreement intended and purposed that the commitment should be a collateral undertaking in the nature of underwriting the obligation of a third party or an original obligation serving or furthering the interests of the promisor. And where doubt exists respecting the pivotal question it becomes an issue of fact to be determined by taking into consideration the language used, the situation of the parties, the objects sought to be accomplished, and the conduct of the parties. Goldsmith v. Erwin, 4 Cir., 183 F.2d 432, 20 A.L.R.2d 240; Allen v. Turner, supra; Clayton Coal Co. v. King, 108 Colo. 63, 113 P.2d 672; Eilertsen v. Weber, 198 Or. 1, 255 P.2d 150; Mann v. Welch, 208 Okl. 580, 257 P.2d 1074; Farmers Federation v. Morris, 223 N.C. 467, 27 S.E.2d 80.

Hatcheries and Processing each had an indirect economic interest in the turkey industry in Utah. Hatcheries looked to the growers of turkeys in that area as an outlet for poults produced at its hatcheries, and Processing looked to such growers for a supply of turkeys for processing in the operation of its business. In entering into the agreement against that background, the parties contemplated that Hatcheries would furnish poults at specified sale prices; that they would be delivered to Processing; that Processing would cause growers to purchase the poults; that Processing would distribute them to the purchasing growers; that Processing would cause to be paid to Hatcheries one-half of the purchase price within thirty days after the arrival of the poults in Utah and would deliver to Hatcheries notes and mortgages executed by the growers for the other one-half of the purchase price; that the notes would be payable to Hatcheries through Processing; that when the turkeys were ready for the market, the growers would bring them to Processing; that Processing would process them, would sell the finished products, and would receive the proceeds; that out of the proceeds, Hatcheries and Processing would be paid the amounts

due them, respectively; and that Processing would then pay the balances to the growers, respectively. The evidence introduced and that tendered but excluded presented for the jury under appropriate instructions of the court the issue of fact whether it was the intention and purpose of the parties that the obligation of Processing should be a collateral agreement underwriting the debt of the growers or an original undertaking in furtherance of its own interests.

▮ With exceptions not having present material bearing, it is the general rule of law in Utah that parties may verbally modify, alter, or change an agreement in writing if the original agreement is not one required by the statute of frauds to be in writing. Bamberger Co. v. Certified Productions, 88 Utah 194, 48 P.2d 489, adhered to, 88 Utah 213, 53 P.2d 1153. Taking the position that the written agreement was not one within the statute of frauds and therefore was open to modification by parol agreement, Processing sought to show that after discovery of the sinusitis among the poults, Hatcheries and Processing agreed verbally to changes which modified their rights and obligations under the written agreement and that Processing discharged its obligations under the agreement as modified. The evidence was excluded upon the ground that the written agreement was within the statute of frauds and therefore was not subject to modification by verbal agreement. We think the evidence should have been admitted and the issue submitted to the jury under appropriate instructions.

▮ Asserted error is predicated upon the refusal of the court to submit to the jury the question of implied warranty. The argument is that under all of the facts and circumstances an implied warranty respecting the condition of the poults should be read into the agreement. The agreement did not contain an express warranty that the poults would be healthy, sound, or free from disease. It was silent in that respect. But that is not conclusive of the question of warranty. Though a contract for the sale of personal property fails to contain an express warranty the law will imply the covenant and courts will enforce it if it can be said from all of the provisions in the instrument taken together and viewed in the light of the surrounding facts and circumstances that a warranty was within the contemplation of the parties or is necessary to carry their intention into effect. Wasatch Chemical Co. v. Leon, Utah, 259 P.2d 301. But in the absence of a controlling statute providing otherwise, where the written contract contains an express stipulation against warranty, none can be implied. Landes & Co. v. Fallows, 81 Utah 432, 19 P.2d 389; Redmond v. Petty Motor Co., 121 Utah 370, 242 P.2d 302.

▮ As previously said, the written agreement into which these parties entered was not one of sale of the poults to Processing. It contemplated the sale of poults from Hatcheries to the growers who obtained them through Processing as the distributing factor. Harmonizing with the practice generally pursued under a like agreement during the preceding year, and in carrying out the agreement presently under consideration, as poults were delivered to growers orders were taken on forms prepared and furnished by Hatcheries. One copy of the order was retained by Hatcheries, one was furnished to the grower, and one was mailed to Processing. The orders expressly provided on the face thereof that they were subject to acceptance by the general office of Hatcheries and to the terms on the reverse side thereof. On the reverse side of the copy retained by Hatcheries and of the copy furnished the grower it was expressly provided "We therefore make no warranty, express or implied, as to the health, quality, or productivity of the chicks or poults delivered, and no agent of Cooperative is authorized to make any warranty or representation to the contrary." Upon accepting an order, Hatcheries issued an "Acceptance

of Order Form." Copies were furnished the growers and Processing. Such acceptances contained on the face thereof language identical with that on the reverse side of the order forms in respect to negativing express or implied warranty. Inasmuch as the agreement between Hatcheries and Processing was not one of sale of poults to Processing, and inasmuch as Hatcheries expressly negatived express or implied warranty in favor of the growers, there was no implied warranty that the poults would be healthy, sound, or free from disease and therefore the court properly declined to submit the question to the jury. Redmond v. Petty Motor Co., supra.

 In its first counterclaim, Processing sought to recover $16,963.29 expended for medicines furnished to growers for use in combatting sinusitis. It was pleaded that Hatcheries agreed to reimburse Processing for such outlays. Hatcheries conceded at the trial that it had agreed to pay the reasonable cost of medicines, and $10,440.95 was allowed as an offset against the amount awarded to Hatcheries under the written agreement. But evidence was offered tending to show that medicated feed was used and that the amount then remaining in controversy represented the differential between the cost of ordinary feed and medicated feed. Processing offered to prove by the witness Milton L. Harmon that for many years he had dealt in feeds for turkeys; that he had kept close track of the use of feeds; and that he knew in general the relative costs of different feeds. Processing also offered to prove by the witness Nate Guss that he operated a feed mill; that he had purchased certain medicines to mix with his feed; that he had been buying the drugs at regularly quoted prices; and that he knew what such prices amounted to. And Processing offered certain accounting summaries made by accountants from the books and records of Processing respecting the quantities of medicated feeds furnished and the differential between the

cost of such medicated feeds and that of like quantities of ordinary feeds. The evidence thus offered was admissible and its exclusion constituted error.

In its first counterclaim, Processing also sought to recover $20,839.70 for commissions, and $20,000 for loss of profits which would have been realized by the processing of heavier turkeys. Both of these asserted items of recovery were predicated upon the postulate that in shipping diseased poults, Hatcheries breached an implied warranty with resulting damage to Processing. But there being no implied warranty, both items were without basis and therefore the directed verdict respecting them was proper.

The judgment is reversed and the cause remanded.