CASE 46—PETITION EQUITY—FEBRUARY 27.

# Corn, &c. vs. Sims, &c.

APPEAL FROM JESSAMINE CIRCUIT COURT.

Exceptions to a deposition, not acted on by the court below, present, in the court of appeals, no question as to the competency of the witness or the admissibility of his testimony. Even if the court below had erroneously decided upon the exceptions, such error, unless excepted to at the time, is waived, and furnishes no ground of reversal.

One who was insolvent at the time, and fully aware of his condition, assigned a note to his sureties, as an indemnity to them in a pre-existing liability, the assignment reciting that it was "to pay, in part, a note to M. B., who holds a note on me, and they security." *Held*—that this was an assignment made by the debtor, in contemplation of insolvency, and with the design to prefer one or more creditors to the exclusion, in whole or in part, of others, and operates as a general transfer of all the debtor's estate for the benefit of all his creditors. (1 *Met.*, 450.)

A promise made by the principal debtor to indemnify his surety out of a designated fund, unless the promise be such as to amount to a contract which would invest the promisee with an equitable right to the *fund*, (as in the case of *Newby, &c. vs. Hill, &c.*, 2 *Met.*, 530,) is not obligatory, and in such case the subsequent assignment of the fund when the assignor is insolvent, to indemnify the surety, operates as a general transfer of all the debtor's estate for the benefit of all his creditors.

Where an assignment is made by a debtor in contemplation of insolvency, and with the design to prefer one or more creditors, to the exclusion in whole or in part of others, which, under the act of 1856, operates as a general transfer of the property of the debtor for the benefit of all the creditors, they take the property and effects of the debtor subject to all valid equities and encumbrances existing at the time the transfer takes place.

A purchaser of land takes subject to the claim of the holder of a prior equity, although such second purchaser may have made his contract and fully paid the purchase money before he had notice of it, provided he has such notice before his own equity is clothed with the legal title. It cannot be claimed for the creditors, under a transfer created by the statute to prevent preferences by insolvent debtors, that they occupy a more favored attitude.

The present as well as the former statutes regulating conveyances, relate to conveyances of the *legal* title only, and contain no provision for the registration of bonds or other written evidences of mere equitable titles. The failure to give publicity to the sale of land, and the transfer of the equity to the purchaser, or the failure of the purchaser to take the open and visible possession, has never been regarded as even authorizing the inference of fraud, or as otherwise impairing, much less defeating, the equity of the purchaser.

Where there is a lien upon a tract of land for unpaid purchase money, and a part of the tract is conveyed by the vendee in trust for his creditors, the balance of the tract having been previously sold by him in good faith for value, equity requires that the land embraced in the deed of trust be subjected to the discharge of the lien before resorting to the other portion. (5 *B. Mon.*, 428; *Brummel, &c. vs. Murray, &c., MS. opin., Winter Term*, 1860.) So, when the transfer is by operation of the act of 1856, to prevent fraudulent assignments in trust for creditors, &c.

JAS. B. BECK, for appellants, cited *Civil Code, sec.* 670, *sub-div.* 4; *act of* 1855–6, *sec.* 1; 1 *Met.*, 451; 2 *Met.*, 52; 1 *Dana*, 168; 14 *B. Mon.*, 638; 3 *B. Mon.*, 451.

W. R. WELCH, on same side, cited 1 *Dana*, 166; *act of* 1856, *session acts* 1855–6, *page* 107; 1 *Met.*, 451; 2 *Strob. Eq.*, 317.

JAMES HARLAN, on same side.

G. & R. T. DAVIS, for Mrs. Sims and children, cited 1 *Hilliard on Vendors*, 4; 26 *Penn.*, 178; 1 *Bibb*, 523; 2 *Ib.*, 509; 4 *Ib.*, 296; 17 *B. Mon.*, 631; 7 *Peters*, 252; 7 *Cranch*, 34; 10 *Peters*, 177; 18 *B. Mon.*, 631; 5 *Mon.*, 293; 7 *B. Mon.*, 84; 18 *B. Mon.*, 631; 7 *Wheaton*, 46; 3 *Dessaus.*, 310; 1 *Smedes & M.*, 45; 4 *Scam.*, 387; 11 *Paige*, 21; 2 *Bibb*, 419; 3 *Marsh.*, 542; 9 *Vesey, Jr.*, 87; *Browning vs. Jett, MS. opin., January*, 1858; *Washington, &c. vs. Cates, MS. opin., January*, 1858; 18 *B. Mon.*, 177; 14 *Ib.*, 647; 6 *Mon.*, 167.

G. S. SHANKLIN, for Price and Muir.

SAME, for Bronaugh, cited *Gill* (*Md.*,) 117, *Malcolm vs. Hall*; *Burrill on Assignments*, 463, 509, 557.

JUDGE DUVALL DELIVERED THE OPINION OF THE COURT:

In March, 1847, James Sims conveyed to his son, John G. Sims, a tract of land, lying in Jessamine county, containing 287¼ acres, for the consideration of $11,498, of which sum one-third was paid in hand, and for the residue the purchaser executed five notes, each for $1,533 07, to secure the payment of which a lien was retained on the land.

In March, 1849, John G. Sims executed to his father-in-law, Manson Seamonds, a bond for the conveyance of 145 acres of this tract, "to be laid off on one end, so as to include the dwelling-house and improvements, for the consideration of $5,800." The bond recites that said Seamonds "had advanced, for the payment of said land, the sum of four thousand dollars, with the understanding that one hundred acres thereof was to be conveyed to him; and whereas, he has this day purchased of me forty-five acres more of said land, at $40 per acre, and has paid me therefor."

It furthermore appears, that Seamonds made his will on the 2d of October, 1847, in which he states that he had already paid for the purchase of land for his daughter, Merilda F. Sims, upwards of two thousand dollars, and he directs that his executor "pay on said purchase of land, which has already been made, by my son-in-law, John G. Sims, a sum sufficient, with what I have already advanced, to pay for 145 acres of said land, and that he take a deed therefor to my said daughter, Merilda Frances, providing that she shall enjoy it during life, and at her death it is to pass to, and be vested in, her children," &c.

Seamonds died in 1856, and his will was admitted to record in the county of Bourbon, where he died and had resided. In a proceeding soon afterwards instituted for the allotment of dower to his widow, the executor filed an amended petition, setting forth the foregoing provision of the will in favor of Mrs. Sims, and the subsequent execution of the title bond to the testator, and asking the court to determine whether, under the will, it was his duty to require the title to the 145 acres of land to be taken to, or for the benefit of, Mrs. Sims, and if so, that it be so decreed. On this amended petition process issued against Sims and wife the 22d February, 1858, and served the same day. On the next day Sims executed to the executor, P. J. Seamonds, a deed of conveyance for the 145 acres of land, reciting the execution of the title bond to M. Seamonds, and the provision of his will before referred to, and that the conveyance was made "only for the purpose of vesting the legal title of said land in the said Preston J. Seamonds, to enable

him, as the executor of said Manson Seamonds, to effectuate and carry out the provisions of said will." On the same day Seamonds executed a conveyance of the land to Mrs. Sims for life, with remainder to her children. It appears that, in April following, in the proceeding in the Bourbon circuit court before noticed, it was decided, that by a proper construction of the will of M. Seamonds, and of the title bond of Sims to him, the wife of the latter was entitled to have the 145 acres of land in question conveyed to herself for life, with remainder to her children, and that it was the duty of the executor under said will to compel Sims to make such conveyance. The judgment directed Sims to execute a conveyance accordingly, and in the event of his failure to do so by the third day of the next term, the commissioner, Smith, was directed to execute it for him. A conveyance in conformity with this order was executed by Smith as commissioner, and approved by the court at its July term, 1858.

Sims, on the 24th of February, 1858, made a conveyance of his entire estate, consisting of land and personal property, to Bronaugh, as trustee, for the benefit of all his creditors. The deed is dated the 23d of February, but was not acknowledged, and, according to the proof, was not in fact signed until the 24th. The land conveyed is described as containing "about two hundred and seventy-seven acres—less by the tract of one hundred and forty-five acres this day conveyed by said Sims to Preston J. Seamonds off the east end of said tract." The trustee was authorized to sell the property, real and personal, for the best price he could obtain, retaining five per cent. for his services, &c., the residue of the proceeds to be distributed among the creditors of the grantor, *pro rata*, if insufficient to pay all his debts in full.

Bronaugh, the trustee, filed this petition in June, 1858, alleging that he had made a sale of the land conveyed, amounting to $8,879 31, and of the personalty amounting to $1,875 56; that he had been notified of the existence of debts against Sims, exceeding the amount of the assets, some of the creditors claiming to have the right to full payment of their demands, and he therefore asks that the court will direct a settlement of

the trust, and a distribution of the fund according to the rights of the parties.

Scott answered, setting up one of the notes which had been given by Sims to his father for part of the original purchase money, and to secure which a lien upon the entire tract had been reserved in the conveyance as before stated, which note had been assigned to Scott, and upon which there was an alleged balance unpaid of about $500.

Throop also asserted a lien upon the land for the payment of two other notes, which had been given by Sims for part of the original purchase money, amounting to about $2,500, and which had come to his hands as the administrator of the vendor, James Sims, deceased.

Two other creditors, Emily Corn and J. C. Wilmore, file their answers and cross-petitions, charging that on the 23d February, 1858, and just before the execution of the deed of trust, and of the conveyance to Seamonds, Sims was the owner of, and had in possession, a note on one Robinson for about $1,080, and that he then assigned said note to Price and Muir, who were then his creditors; that said assignment was made in contemplation of insolvency, and with the design to prefer them as his creditors; that the assignment was fraudulent as to the other creditors of Sims, and operated as a transfer of all his property for the benefit of such creditors, who, occupying the position of innocent creditors, without notice of the title bond made by Sims to Seamonds in 1849, are not affected by it; that the deeds from Sims to Seamonds, and from the latter to Mrs. Sims and her children, are fraudulent as to creditors, and should be set aside; that the deed of trust was made subsequent to the assignment of the note to Price and Muir, and after the property of Sims had, by operation of law, passed to his creditors, and they pray that all the several conveyances mentioned, as well as the assignment of the note, be set aside; that the property of Sims be sold, and the proceeds equally distributed among his creditors, &c.

Price and Muir answer, denying all the material allegations of the cross-petitions. They say they became the sureties of Sims on his notes given in 1856, for mules purchased from one

Dodge, amounting to $3,600; that they were induced to execute the notes by an agreement they made with Sims at the time, that the proceeds of the sales of the mules were to be applied to the payment of the notes on which they were bound; that the notes were subsequently renewed under the same agreement, and were then assigned to one Brown, and Sims afterwards sold the mules to Robinson, from whom he received two thousand dollars of the purchase money, which he paid to Brown on the notes, and then promised his sureties, that if they would execute with him a new note to Brown for the balance due on the two notes held by him, he would assign to them a note he had taken from Robinson for $1,080, the balance of the price at which he had sold the mules, which note the sureties were to collect and apply the proceeds to the payment of the debt for which they were bound; and under that agreement and promise they consented to, and did again become bound to Brown in a note executed the 1st January, 1856, for $1,958, payable four months thereafter; that this transaction occurred at Nicholasville, Sims stating that the note on Robinson was at his house in the country, and that he would thereafter hand it over according to the arrangement mentioned; but on account of their own neglect the note did not come to their hands until the morning of the day on which the deed of trust was acknowledged, when Sims sent the note to Price, under and in pursuance of the agreement stated. This is substantially their history of the circumstances under which the assignment in question was made.

Seamonds and Mrs. Sims also answer, denying the alleged fraud in the execution of the conveyances under which the latter claims the 145 acres of land for herself and children, and insist upon the validity of her title under the provision of the will, and the title bond in pursuance of which those conveyances were made.

The circuit court rendered a judgment sustaining the claim of Mrs. Sims and her children to the 145 acres of land; sustaining also the validity of the assignment of the note to Price and Muir, and dismissing the cross-petitions assailing that assignment. The judgment also sustains the deed of trust, and

directs the trustee first to discharge the liens in favor of Scott and Throop, with the funds in his hands, and to divide the residue, *pro rata*, among the creditors.

From that judgment Mrs. Corn and Wilmore have appealed, insisting that it should be reversed upon the following grounds :

1. That John G. Sims was an incompetent witness, and that the court erred in not excluding his testimony.

2. That the assignment of the note to Price and Muir was made in contemplation of insolvency, and conferred upon the assignees no right to the proceeds.

3. That the conveyance of the 145 acres of land by Sims to Seamonds, and by the latter to Mrs. Sims, were fraudulent in law and in fact, and should have been set aside.

4. That the whole tract of land purchased by Sims from his father should have been held subject to the lien for the unpaid purchase money.

These points will be briefly considered in the order in which they are stated.

1. The exceptions to the deposition of Sims were not acted on by the court below, and therefore no question as to the competency of the witness, or the admissibility of his testimony, is presented. Even if the court had erroneously decided upon the exceptions, such error, unless excepted to at the time, is waived, and furnishes no ground of reversal here. (*Civil Code, sec.* 653.) We need not refer to the numerous recent decisions which settle this point conclusively.

2. That Sims was insolvent at the date of the assignment of the note, on Robinson, to Price and Muir; and that he was himself fully aware of his insolvent condition, at the time, are facts about which there is no controversy. The effect of the assignment, therefore, was to secure the assignees in their liability as his sureties in the debt to Brown. By the very terms of the assignment it was made to Price and Muir, "to pay, in part, a note to M. Brown, who holds a note on me, and they security," and it therefore operated not only as an indemnity to the assignees, but as a security for the debt on which they were bound as sureties. The legal deduction from these facts

must necessarily be, nothing else appearing, that this was an assignment made by the debtor, in contemplation of insolvency, and with the design to prefer one or more creditors, to the exclusion, in whole or in part, of others, and is within the act of 1856, (*session acts*, 1855–6, *page* 107,) as expounded by this court in the case of *Terrill vs. Jennings, &c.*, (1 *Met. Ky. Rep.*, 459.)

But the assignees, in their answer, seek to avoid the effect of the statute, and to maintain the validity of the assignment by the *agreement* or *contract*, alleged by them to have been made with Sims at the time they agreed to become bound as his sureties in the debt to Brown. We might concede that this agreement, *as alleged*, would have operated to invest them with an equitable right to the note, upon the principles settled in the case of *Newby, &c., vs. Hill, &c., (decided at the Winter Term*, 1859, 2 *Met.*, 530.) The evidence, however, fails to establish any such agreement. Sims, the only witness who testifies upon the subject, says that before his sureties signed the note he told them that the proceeds of the sale of the mules should be applied to its payment, that it was his intention sacredly to so apply the money ; that at the time they signed the note there was no agreement between them and himself that they should have the note, but it was his intention to collect the money and pay the debt on which they were bound; that eight or ten days after his sureties had become bound he told one of them that he "wanted them to have the note he held on Robinson," &c.

The circuit judge, in the opinion delivered by him, concedes, virtually, the insufficiency of the proof to support the alleged agreement, but sustains the validity of the assignment upon the ground that the promise of Sims to apply the proceeds of the sale of the mules, as just stated, was consistent with justice, and that his sureties, to whom this promise was made, had a claim upon his integrity for its fulfillment.

It seems to us quite clear that the adoption of this principle would defeat the leading object of the statute referred to, and deprive it of all its efficcay, by tolerating the very evil which it was designed to remedy. What was the nature, extent, and

legal effect of the promise relied upon as sanctifying this act of preference? It was simply a promise to pay a particular debt out of a particular fund, to be thereafter raised by the sale of the property designated. It was no more obligatory, in law or in conscience, than a promise by the debtor to pay any other debt, or to indemnify any other surety. Every creditor and every surety of Sims had a like claim upon his integrity for the fulfillment of all his engagements. The written promise contained in an obligation for the payment of money is of as high a nature, and gives to the holder as strong a claim upon the integrity of the promisor, as any subsequent verbal promise to pay the same debt out of a particular fund thereafter to be raised. And so a promise made by the principal debtor, to indemnify his surety out of his general estate, is just as obligatory in law and in morals as a promise to indemnify out of a designated fund, unless the last mentioned promise were such as to amount to a contract, which would invest the promisee with an equitable right to the *fund*, as in the case of *Newby, &c. vs. Hill, &c., supra.* Suppose that Sims, instead of assigning the note had mortgaged to his sureties the mules, the proceeds of the sale of which he had promised to apply as stated, for the purpose of indemnifying them against their *pre-existing* liability, would the previous pledge or assurance, however solemnly made, have been deemed sufficient to uphold such mortgage, and to exempt it from the operation of the statute?

The language of the act is, "that every sale *mortgage*, or *assignment*, which shall be made by debtors in contemplation of insolvency, and with the design to prefer one or more creditors to the exclusion in whole or in part of others, shall operate as an assignment of all the property and effects of such debtor," &c.; but a "mortgage made in good faith, to secure any debt or liability *created simultaneously* with such mortgage," is not affected by the provisions of the act.

This record presents the case of an assignment made by the debtor in contemplation of his insolvency, not to secure a liability created simultaneously with it, but to secure a pre-existing liability, the effect as well as the design of the transaction being to prefer the assignees to the exclusion of other credi-

tors. The case is, therefore, clearly and strictly within the letter, spirit, and policy of the statute. The object of the legislature was to deprive the insolvent debtor of the right to make any preferences among his creditors, the claims of all being deemed equally meritorious. It is evident that this object would, in almost all cases, be defeated by sanctioning a preference, whether created by *sale*, *mortgage* or *assignment*, upon the ground of an antecedent promise or assurance on the part of the debtor such as is relied on here. Such promises from an embarrassed and failing debtor are, in general, easily obtained, and would be as easily proved.

3. Upon the third ground relied on for reversal, but little need be said. The question made by the evidence, and argued by counsel, whether the assignment of the note, the effect of which has just been considered, was made before or after the execution of the conveyance by Sims to Seamonds, is considered wholly immaterial to the rights of the parties involved in this branch of the case. Nor is it necessary to decide upon the effect to be given to the proceedings and judgment in the Bourbon circuit court, as the right of Mrs. Sims and her children to the 145 acres of land in contest is maintainable upon other grounds.

That this land was purchased in good faith by the father of Mrs. Sims, for the purposes indicated in the provisions of the will, cannot be, and indeed has not been, seriously controverted. It is also proved beyond question that he fully paid the purchase money at some period between the making of his will and his death, which occurred in 1856. Here, then, was a complete, valid, and enforceable equity, further evidenced by the bond of Sims to Seamonds in March, 1849, untainted by even a semblance of actual fraud, subsisting at the time when, by operation of law, the property and effects of Sims were transferred to his creditors for the payment of their debts. Whatever may be the nature and extent of the right thus acquired by the creditors, it is very certain that they take the property and effects of the debtor subject to all valid equities and incumbrances existing at the time the transfer takes effect. It is the well settled doctrine that a purchaser of land takes

subject to the claim of the holder of a prior equity, although such second purchaser may have made his contract, and fully paid the purchase money before he had notice of it, provided he has such notice before his own equity is clothed with the legal title. (*Halley, &c. vs. Oldham, &c.*, 5 *B. Mon.*, 237, *and numerous other cases*.) It cannot be claimed for the creditors, under a transfer created by the statute, that they occupy a more favored attitude. It is clear, therefore, that the prior equity of Mrs. Sims and her children, created at the time and in the manner stated, was not affected by the act of her husband, which resulted in the transfer of his estate to his creditors, and must be regarded as superior to any right or claim acquired by the latter.

The present as well as the former statutes regulating conveyances, relate to conveyances of the *legal* title only, and contain no provision for the registration of bonds or other written evidences of mere equitable titles. (*Morton vs. Robards, &c.*, 4 *Dana*, 260.) The sale of land by transferring an equity to the purchaser must, in the very nature of the case, be private, and the failure to give it publicity, or the failure of the purchaser to take the open and visible possession, has never been regarded as even authorizing the inference of fraud, or as otherwise impairing, much less defeating, the equity of the purchaser. Besides, it is obvious in this case that the possession of the land by Sims was perfectly consistent with the equitable title of his wife and children.

We are satisfied, therefore, that the court below properly sustained their claim to the land in contest.

4. We also concur with the circuit judge in his conclusion that the land embraced in the deed of trust to Bronaugh was alone subject to the discharge of the subsisting liens for the unpaid purchase money. Upon this point we need only refer to the case of *Winfrey vs. Williams' executors, &c.*, (5 *B. Mon.*, 428,) and *Brummel, &c. vs. Murray, &c.*, (*MS. opin. present term.*) The rule as settled in the case of *Dickey vs. Thompson*, (8 *B. Mon.*, 316,) rests upon different principles, and does not apply to the facts of this case.

Corn, &c. vs. Sims, &c.

The judgment, for the reasons and on the grounds stated, is reversed, and the cause remanded with directions to add the proceeds of the note assigned to Price and Muir, to the fund for distribution among the creditors of Sims. And as the distribution provided for by the deed of trust is the same as the distribution would be under the assignment created by the statute, the reversal will have no other effect, and the judgment need not be otherwise disturbed or modified, than as just indicated.