Argued October 5; affirmed November 3, 1948

# DUDLESTON *v.* CHIRAVOLLATTI
### 198 P. (2d) 858

L. A. *Recken* argued the cause for appellant Chiravollatti and *John D. Galey* argued for appellant Paul Jones. On the joint brief of appellants were Senn, Recken & Recken, and Fred Gronnert, all of Portland, and John D. Galey, of Sweet Home. On the supplemental brief of appellant Jones were Galey and Galey, of Sweet Home.

*David Spiegel* argued the cause for respondents. On the brief were Lenske, Spiegel & Spiegel, of Portland.

Before ROSSMAN, Chief Justice, and BELT, BAILEY and BRAND, Justices.

BAILEY, J.

This action was brought by Marvin W. Dudleston and Frances Dudleston, his wife, against Joe Chiravollatti and Paul Jones to recover damages on account of alleged fraud and misrepresentation by the defendants in the sale by them to the plaintiffs of a parking lot and service station business. The complaint alleges that on or about September 18, 1946, and prior thereto, Joe Chiravollatti was the owner of a parking lot and service station business at the corner of S. W. Fifth Avenue and S. W. Madison Street, Portland, Oregon, and that Paul Jones was his agent for the sale thereof; that on or about September 18 defendants Chiravollatti and Jones, and each of them, represented to plaintiffs "that said parking lot and service station business was a profitable business and the net profit that the same had been bringing in during the preceding year was over $600.00 per month and was of such value that said parking lot would continue to bring a net profit of more than $600 per month during the balance of the term of the lease that covered said business, which was an ad-

ditional two years; that defendant and each of them represented to plaintiffs that the net profit from the operation of said business for the preceding year was equivalent to the amount sought by the defendants as the purchase price of said business from the plaintiffs, and that the net profit from the operation of said business for the coming year would be as much or more than the purchase price of said business.''

It is further alleged that such representations were made by defendants to induce plaintiffs to purchase the parking lot and service station business at a ''price substantially in excess of the true value thereof''; that plaintiffs relied upon such representations ''and believed the defendants and each of them, and based upon said representations, plaintiffs did purchase said business and the assets thereof on or about September 18, 1946 for the sum of $7,500.00''; that said representations were false; that the net profit from such business for the preceding year was substantially less than $600 per month; that said parking lot, if operated in the same manner as during the preceding year ''could not and would not bring a net profit of anywhere approaching $600.00 per month,'' and that by reason of such fraud and misrepresentation plaintiffs were damaged in the sum of $2,275.

Defendants filed separate answers. In the one filed by Chiravollatti he admits that on or about September 18, 1946, and prior thereto he was the owner of the parking lot and service station business referred to in the complaint and that on or about September 18, 1946, plaintiffs purchased the same from him. He denies all the other allegations. Defendant Jones, in his answer, denies all the allegations contained in the complaint.

The case was tried to a jury which returned a verdict in the sum of $1800 in favor of plaintiffs. From the judgment entered thereon both defendants have appealed.

Defendants filed a joint brief containing four assignments of error. The first assignment is based upon the denial by the court of defendants' motions for directed verdicts because of the alleged failure of plaintiffs to prove that Chiravollatti and Jones had represented to them that the parking lot and service station business had made a net income of $600 per month during the preceding year. The other three assignments of error relate to instructions given by the court. Defendant Jones filed a supplemental brief containing only one assignment of error in which he asserts that the court erred in denying his separate motion for a nonsuit and for a directed verdict "on the ground that none of the representations complained of were made by defendant Jones as of his own knowledge, but were only the repetitions of information given him by his principal."

We shall first discuss the question whether the court erred in denying defendants' motions for directed verdicts. On September 15, 1946, defendant Chiravollatti was operating a 75 x 100-foot parking lot located on the northwest corner of S. W. Fifth Avenue and S. W. Madison Street in the city of Portland, Oregon, under a lease at a rental of $250 per month, which lease would expire in approximately two years. The service station located thereon was owned by Chiravollatti and consisted of two buildings, one of which was used as an office, two gasoline pumps, a wash rack, a hydraulic lift, oil containers and miscellaneous tools.

On or about the 13th day of September, 1946, Chiravollatti listed this property with Jones, a real estate broker, for sale at the price of $8500. Jones thereupon caused to be published in the Sunday Oregonian, on September 15th, in the classified advertising section, under the heading of "Business Opportunities" the following advertisement:

"Parking Lot

"Right in the heart of downtown Portland. Gas station, car washing, lub., etc. Short time lot, quick turnover, low rent, good lease. Owner nets over $600 a month. Investment earned in one year. Price $8500 cash. Better hurry.

"Paul Jones, Real Estate

4637 N. E. 40th.                            Mu 5430."

The following day Marvin Dudleston telephoned to Jones and inquired about the lot and arranged to meet him at the parking lot on Tuesday. Mr. Dudleston testified that he asked Jones "if this business was netting the owner $600 a month, and he said, 'Oh, yes, that is exactly what it is'." He stated that this conversation took place in the presence of Chiravollatti. "I asked him", he stated, "if it would be permissible, if I could see his books. And Joe [Chiravollatti] kind of goes like this (illustrating). He says 'Oh, no, we can't be showing our books to everybody that comes around here. That is my business. I don't make my business everybody's business. You will have to make yourself a buyer before you see my books".

Mrs. Dudleston did not see either Jones or Chiravollatti until the day after her husband had met them, at which time she saw Mr. Jones at the office where

she was employed and also at the Dudlestons' apartment. She testified as follows:

"Q. When did you next have contact with either of the two gentlemen? A. I don't recall the exact date. We saw them several times during that week; making out the papers and meeting and going to see the owners and looking over the lease and one thing and another. .

"Q. Was anything further said about the income on the property? A. Well, every time it was mentioned we were assured it was making $600 a month and more.

"Q. Did you make inquiry about that income? A. Yes, I did.

During the negotiations Jones, according to Marvin Dudleston's testimony, stated that he had known Chiravollatti for a long time, that "they had worked together and that he [Jones] knew he [Chiravollatti] was a man of good reputation, and he knew he was making $600 a month and he was netting that from the business, and, by Gosh, we could take his word for it too, because he had seen his books."

Jones testified that he did not see Chiravollatti's books until some time after the transaction was consummated and that he had never examined them. Jones further testified that, before the deal was closed but after the earnest money receipt had been executed, Chiravollatti had signed a document referred to as a bulk sales affidavit and that this affidavit was shown to Mr. Lenske, plaintiffs' attorney, who claimed that it did not meet the requirements of the bulk sales law. Jones further stated that Lenske called Marvin Dudleston's attention to the figures on this document and said: " 'According to these figures, $950 to $1,150 a month'—and he looked at the ceiling and thought a

while, and he says 'I don't know; it doesn't look like he could make $600 a month according to that.' 'Well,' I said, 'I am sure I don't know anything about it.' Then he looked at Dudleston and asked him, he says 'How about that, Dud; have you thoroughly gone into the matter of the income of the property? According to this here I don't think you can make $600 a month.' Dudleston said 'Well, I don't know.' He says 'Of course, Jones says that Joe is making it, and Joe said he was making it, so it is O. K. with me; and Jones claims he knows Joe, and he is an honest man. * * * "

Jones was asked on direct examination whether the Dudleston's had ever requested, before the deal was closed, to see Chiravollatti's books, to which he answered: "I believe the night that I visited them at their apartment the question of the — of income was discussed, and also the question of looking at various books and things that Joe might have, was discussed, and I told them just exactly what I tell all persons, that before you can have that information available to you, you must put yourself in the position of a bona fide buyer; you have got to put some money down to indicate that you are in the market to buy, and then when you are in the market to buy, whatever books or papers or paraphernalia is available will be furnished to you by the owner."

It was on or about the 12th of September, 1946, that Jones talked to Chiravollatti about listing the service station with him for sale. Jones testified that Chiravollatti informed him about the property being leased to him, the duration of the lease, and the monthly rental. Chiravollatti also told him that he was making about "$600 a month" and that the price which he was asking for the property was $8,500. He also

testified that while he was talking with Chiravollatti "I was visualizing this ad I was going to place, and the conversation was more or less to the effect that 'Well, let's see; if a man can'—I said 'If a man can make $600 a month, he can make that back in a year.' So I hastened down to the Journal and wrote an ad, which was in the paper, and for the Oregonian, which appeared in the paper, for Sunday, the following Sunday, * * *.'' Jones swore that he told Marvin Dudleston that Chiravollatti "claims he was making $600 a month". He said that he never told either Mr. or Mrs. Dudleston that he knew that Chiravollatti "was making $600 a month on that lot", nor did he tell them that they could take his "word for it that Joe was making $600 a month on that lot".

Chiravollatti testified that he told Mr. Dudleston that "I think that you can make $600 a month if you get in and hustle," and that "This place is a lot of work". He stated that he had never told the plaintiffs, or either of them, that he had been making $600 a month. He did not remember whether or not he had told Jones that he had been "netting over $600 a month". He further testified:

"Q. Had you been making $600 a month there? A. Yes, I had been making it, because the last three months showed that I was capable of making $600 a month there.

"Q. You heard the—now, this exhibit, Plaintiff's Exhibit 3, I think you are familiar with that, aren't you? A. Yes.

"Q. Does that represent a true statement of your—what you took in and your earnings? A. Yes, it does.

"Q. For the months of July, August and part of September? A. Correct."

Plaintiffs' Exhibit 3 above referred to consists of three sheets purporting to show the receipts and expenses for the service station for July and August and the first 24 days of September, 1946. It appears from this exhibit that the profits for July, August, and the first 24 days of September were $556.71, $603.45 and $535.38 respectively. None of these statements include expenses incurred for help at the service station, although Chiravollatti had a helper most of the time. Some of the time his employee was paid on a commission basis, and part of the time at the rate of $1.00 an hour.

We quote from Chiravollatti's testimony, as follows:

"Q. Isn't it a fact that the two months that you have presented here, July and August, are the only ones that approached the figure of $600, and that is why you submitted them? A. Yes; but I would surely strike a minimum; I wouldn't strike a maximum.

"Q. Then the statement in the advertisement that you were netting over $600 a month is the minimum that you were earning? A. No, I don't mean that. I mean, as I say, I told him 'I think you can make $600 a month.' Now, it is up to the individual surely.

\* \* \*

"Q. What was your net income for the month of June, 1946? A. Of June?

"Q. Yes. A. It was around Two Hundred and some Dollars.

\* \* \*

"Q. What was your net income for the month of May? A. I can't tell you that; I am sorry, I can't tell you that.

"Q. Was it approximately the same as June? A. I can't tell you.

"Q. What was your net income for the month of April, 1946? A. I couldn't tell you.

\* \* \*

"Q. Did it approximate June of $200? A. Well, June was an awful slow month. But before that and after that things were a little different.

"Q. Of March, 1946? A. I am sorry, I can't tell you.

\* \* \*

"Q. What was your monthly income for the month of February, 1946? \* \* \* A. I can't approximate it.

"Q. What was your monthly income for January, 1946? A. I can't tell you.

"Q. How much for the year 1946 up until the time that you sold \* \* \* A. I don't remember that."

Prior to purchasing the property Mr. Dudleston spent several hours a day for two or three days at the service station observing the business being done by Chiravollatti. He stated that he was unable, however, to ascertain the amount of Chiravollatti's daily receipts. He testified that he had had no previous experience with parking lots but had operated, as manager, service stations intermittently over a period of two or three years.

Plaintiffs paid $7500 for the parking lot and service station, the price having been reduced from $8500 at their request. The price included the assignment of the unexpired term of the lease and of the $500 deposit which had been made by the lessee to the lessor as rental for the last two months of the lease; the sale and transfer of the service station; and 500 gallons of gasoline and 30 gallons of oil. The transaction was consummated on the 23rd or 24th day of September and plaintiffs went into possession of the property

on the latter date. After operating the property three or four days plaintiffs decided that it was impossible to make $600 a month net and that defendants had misrepresented to them the amount of the profits which Chiravollatti had been making. They immediately took the matter up with Jones. On September 27th plaintiff's attorney wrote to Mr. Jones stating that the property had been purchased upon the representation that it was bringing in a net profit of $600 a month and that after operating the business a few days Mr. Dudleston "ascertained that it could not have brought that amount of profit or anywhere near it." It is further stated in that letter that the listing of the property with Mr. Jones for sale was without prejudice to any rights that Dudleston "has against either you or Joe."

This property was operated by the Dudlestons for 31 or 32 days and during that period they made a net profit of $345. The property was sold by the Dudlestons through Jones, as their real estate broker, to Jerry and Edward Adamski on October 26, 1946, for $5500. Edward Adamski testified that their average monthly income during the four months since they had purchased the property was $295.

██ In determining whether the trial court erred in denying defendants' motions for directed verdicts, we must consider the evidence in the record and every legitimate inference that can be drawn therefrom in the light most favorable to the plaintiffs. It is not our function to weigh or evaluate the testimony. We are charged with the duty of ascertaining whether there is substantial evidence to support the verdict of the jury. *Fish v. Southern Pacific Co.,* 173 Or. 294, 301, 143 P. (2d) 917, 145 P. (2d) 991, and authorities therein cited.

Applying the foregoing principle we are of the opinion that there is substantial evidence in support of the allegations of the complaint that defendants and each of them represented to plaintiffs that the parking lot and service station business had produced a net profit of over $600 a month during the preceding year. The advertisement which defendant Jones prepared and caused to be published expressly states that the owner "nets $600 a month" and "Investment earned in one year." The inference which one naturally would draw from this statement is that a profit of at least $600 a month had been made during a period of, at least, one year. The advertisement does not speak of the future, but of the past. It states what had been earned, not what may be earned. Chiravollati knew that this advertisement had been published in the newspaper and he did nothing to disclaim Jones's authority to publish it.

■ There is evidence that both Jones and Chiravollatti told Mr. Dudleston that the business was producing a profit of more than $600 a month and that Jones told Mr. Dudleston that he knew Chiravollatti was making more than $600 a month, and "by Gosh, we could take his word for it, because he had seen his books." There is substantial evidence from which the jury could have found that the representation made by the defendants as to the past earnings of defendant Chiravollatti were false and fraudulent and that those made by Jones, both in the printed advertisement and in oral statements to the plaintiffs, were not, and did not purport to be, based upon information given to him by Chiravolatti, and that these representations were also false and fraudulent. No error was committed by the Circuit Court in denying defendant's motions for directed verdicts.

■ The other three assignments of error, as we have already stated, are based upon exceptions taken to instructions given by the court. Rule 13 of the rules of this court, 9 O. C. L. A. 315, at 328, and 170 Or. 715, at 724, requires that an assignment of error based upon an alleged error of the court in the giving of an instruction shall "set out instruction and objection made thereto, both *haec verba*". Defendants' brief does not comply with this rule. The brief, in two of the assignments, merely sets out the instructions given and fails to set out the objections thereto; in the other assignment it neither sets out the instruction given nor the objection thereto. In numerous decisions we have called attention to Rule 13 and the failure of some of the members of the bar to observe its provisions and have attempted to impress upon them the necessity of compliance with it. See *State v. Aschenbrenner*, 171 Or. 664, 138 P. (2d) 911, 147 A. L. R. 1052; *Penn v. Henderson*, 174 Or. 1, 146 P. (2d) 760; *Natwick v. Moyer*, 177 Or. 486, 163 P. (2d) 936; *Hall v. Pettibone*, 182 Or. 334 187 P. (2d) 166, 167; *Cameron v. Goree*, 182 Or. 581 189 P. (2d) 596, 608. Moreover, especial attention has been directed to the provisions of Rule 13 in the Oregon Advance Sheets over a long period of time.

Regardless of the failure of the defendants to comply with the foregoing rule, we have examined these three assignments and find that they are without merit. Because of defendants' failure to comply with Rule 13 we deem it unnecessary to set forth the instructions and the objections thereto or to discuss them in detail.

The judgment appealed from is affirmed.