Argued March 17, affirmed April 8,.1953

# EILERTSEN v. WEBER ET AL.

255 P. 2d 150

*Richard Bryson,* of Eugene, argued the cause for appellants. On the brief were Bryson & Bryson, of Eugene.

*John P. Ronchetto,* of Portland, argued the cause for respondent. With him on the brief were Thomas R. Mahoney, of Portland, and Herman P. Hendershott, of Eugene.

Before LATOURETTE, Chief Justice, and LUSK, BRAND, TOOZE and PERRY, Justices.

PERRY, J.

This is an action at law to recover in quantum meruit for work and labor performed. The plaintiff prevailed and the defendants appeal.

The defendants assign as error the trial court's refusal to grant their motion for a directed verdict, their contention being that the oral promise of the de-

fendant Vernon F. Weber to pay the sum recovered is a promise to answer for the debt, default or miscarriage of another and is within § 2-909, subsection 2, OCLA (statute of frauds) and therefore all oral evidence of the promise is incompetent; on the further ground that there was a complete failure of consideration for the promise of the defendants; and further, that the court erred in refusing to give an instruction to the effect that if the jury found that the defendant Weber's promise was an original promise for the completion of the work, then they must segregate plaintiff's demand, that is, the value of the work that he had already done prior to the defendants' promise and what he earned thereafter, and, if they are unable to make a determination of the value of the work done before the promise and that following the promise, then the verdict should be for the defendants.

The defendants, some time in May or June, 1948, entered into an agreement with a Mr. Abbott to construct a building in Florence, Oregon. Plaintiff, being a plumbing and heating contractor, was given a subcontract to install the plumbing and heating in the building. The total amount due for labor and materials on the completion of the work, plus extras, was the sum of $8,857.17. The plaintiff was paid $3,000 on October 18, 1948, by the contractor, Mr. Abbott, and, on March 7, 1949, the defendant Vernon Weber paid him $1,500. The plaintiff completed his work, and, having been paid nothing except as set out above, instituted this action for the balance which he claimed of $4,357.17.

It is the defendants' contention that the plaintiff, as a subcontractor employed by the general contractor, performed the work and furnished the material under

his contract with the general contractor; that Weber's agreement, if any, was a collateral agreement to indemnify the plaintiff; that it was not in writing, and therefore came within the statute of frauds. § 2-909, subs. 2, OCLA, supra.

The plaintiff contends that, the general contractor having failed to pay his moneys as they became due as the contract progressed and having refused to proceed further, his contracts with Abbott, the general contractor, were at an end, and that he continued with the work only because of the new promise of the defendant Vernon F. Weber, as agent for all the defendants, to pay him for the work then completed and for the work to be done.

In determining whether the trial court erred in denying defendants' motion for a directed verdict, this court cannot weigh the conflicting evidence but is required to consider the evidence in the record and every legitimate inference that can be drawn therefrom in a light most favorable to the plaintiff. *Dudleston v. Chiravollatti,* 184 Or 405, 198 P2d 858; *Fish v. Southern Pacific Co.,* 173 Or 294, 301, 143 P2d 917, 145 P2d 991, and authorities cited therein.

The plaintiff testified that he was an experienced heating and plumbing contractor, and, further, as follows:

"Q. Do you know Mr. Abbott? A. Yes.

\* \* \* \* \*

"Q. Could you tell the jury when you first became interested in this project of installing the plumbing and heating in this particular building? A. Well, it was around the 1st of August, we filed this proposal.

\* \* \* \* \*

"Q. And that proposal was filed between you— A. And Grant Abbott. That was to do the building in this said building.

* * * * *

"Q. And then later on, was there another agreement signed between you and Mr. Abbott covering the heating? A. At the time, they were in an awful hurry to get the plumbing in because they wanted to get the footings; and I went ahead and roughed in; and they wanted a proposal on the heating. And I was a little slower in getting a figure in on that.

* * * * *

"Q. Just a minute. Of course, we can't go into what they did, Mr. Eilertsen. That was about the 15th of October, you say, Doctor Weber said you could have the heating, too, and the estimate was signed. A. Yes, sir.

"Q. I will ask you if you can identify plaintiff's Exhibit A and B, Mr. Eilertsen. State if you know what they are. A. This is the plumbing.

"Q. As prepared by you? A. Yes.

"Q. And signed by whom? A. Grant Abbott.

* * * * *

"Q. Now, referring to these exhibits which have not yet been entered into evidence, are you able to tell the jury exactly how this contract which you are holding was split, without the extras? A. The plumbing contract on the Weber and Dunn building, that rough-in and setting fixtures complete, was $4110; and the heating contract, total price, was $4350.

"Q. Where did the item of $397.17 extras come in? Was that subsequent to these extras? A. It was a mezzanine added, a beauty salon on the mezzanine, was a big item; and also, moving of a toilet in the apartment—Doctor Weber's section.

* * * * *

"Q. Coming up to March 4, 1949, will you tell the jury, what was said between you and Mr. Weber or either of the defendants or both of them—and, if

anything, under what circumstances the conversation rose? A. Well, I came to Florence with my pickup with the idea of picking all the fixtures up and taking them back to Newport. His promises hadn't been fulfilled. He had promised to pay me since December.

Mr. Bryson: If the Court please, if he is testifying as I think he is as to promises made by our clients, the defendants—

The Court: Well, he said, 'He'. Of course, you can bring out who he has reference to.

\* \* \* \* \*

"Q. What happened when you came down to Florence that day? A. Well, finally—finally we got to see Doctor Weber. And he was in a hurry to get his fixtures set and wondered why we weren't setting them. And I said I couldn't set fixtures on premises until I got paid, so he told me he would pay me personally for the work that had been done, and also what was coming after I had set the fixtures if I would please stay and set the fixtures.

Mr. Bryson: If the Court please, I renew my objection for the same reason under the statute of frauds on the promise of any of these defendants to pay Mr. Eilertsen, the plaintiff, for any part of the work he was doing for Mr. Abbott.

\* \* \* \* \*

"Q. Do you remember the exact conversation— tell us, if you can. If you remember Doctor Weber's words. A. Well, as near as I can remember, he said if I would complete the job he would pay me what I had done previously, and when I had finished the job he would pay the contract off in full.

"Q. What did you do then, Mr. Eilertsen? A. Well, I says, 'How about the money?' Well, he said, 'I can't pay all of it now.' He said, 'I'll try to rustle some money for you.'

"Q. Did he pay you? A. He did not—not that day. So we went ahead and set some fixtures; and

on Monday, I went down at seven and he give me a check for fifteen hundred dollars.''

The plaintiff then proceeded to set the fixtures and complete the work to be done. He made several demands upon Dr. Weber after the work was completed but received no further payments.

The plaintiff testified further:

''Q. Now, if I understand your complaint, Mr. Eilertsen, you had some work and you asked Abbott for pay, and you didn't get it, or at least not until later and not in full. A. Up until January 1, and then Doctor Weber decided he would take over the payment of it. He promised me that he would take care of all payments from then on.

''Q. Up until then, you had been going to Abbott for your money? A. That's right.

''Q. And if things had gone normally you would have gone to Abbott for your money, and assuming he did pay you, you would have kept going to him for money all the way through the job? A. Naturally.

''Q. And when you had finished you would have expected payments from him? A. If he kept his payments up.

''Q. Now, then by reason— A. He defaulted his payments when he didn't pay the roughing-in of the heating in December. That is the reason I went to Doctor Weber.

\* \* \* \* \*

''Q. But you did feel that if you could get the doctors to promise you in addition to Abbott's responsibility that they would back that up, that you would be justified in going on. A. After January, Abbott was out of the picture as far as money was concerned. I always made my requests for money to Doctor Weber.

\* \* \* \* \*

"Q. Well, had your experience told you then that if they paid Abbott you might not get to see that money? A. No.

"Q. If they paid Abbott you would get your money from Abbott. A. As I said, after January 1, I didn't go to Abbott for money any more. It wasn't my concern whether they paid Abbott then. It was whether they paid me.

\* \* \* \* \*

"Q. Isn't it true that between the time you finished that building, and the time that Mr. Mahoney wrote to the defendants in April, 1950, you didn't make any effort whatsoever to collect any money from Mr. Abbott? A. That's right, I didn't."

Mr. Dobson, who was employed by the plaintiff, testified as follows:

"Q. Mr. Dobson, directing your attention to the date, the forepart of March, 1949, were you in Florence? A. I was.

\* \* \* \* \*

"Q. About March 4. What was your occasion of being in Florence at that time. A. From what I gather, we was supposed to go down there to pick up the materials that wasn't—the plumbing fixtures because they wouldn't pay, and he was going to take them back to the shop.

"Q. When you say 'we' who do you mean? A. Mr. Eilertsen and myself.

\* \* \* \* \*

"Q. What happened after you got down there? You got down to the building about March 4. A. We went down there and stood around a little while, and pretty soon Mr. Eilertsen got hold of Doctor Weber, and they were talking around there, the four of us.

\* \* \* \* \*

"Q. Tell the jury, if you please, what was said if anything, by the parties there, particularly this Doctor Weber. A. Well, he said, 'What are we going

to do?' And George said he was going to take the materials back; and he said, 'Don't take that back; I want the work done.' And the Doctor would pay him for the work that he had done and the work of putting in the fixtures. \* \* \* \* \* Well, he said, 'I will pay you for work you have done and installation of the fixtures; and go ahead and do it.' And it didn't interest me much more, \* \* \* \*"

Mr. Hanson, labor foreman for the general contractor, Grant Abbott, testified as follows:

"Q. And were you present during any conferences or conversations then on the day of March 4 between Doctor Weber and Doctor Dunn, or Mr. Eilertsen, or anyone else? A. Well, I can state from the start it was—they were after him to get George down there to complete that building, and I was kicked around about getting him down there, and I told Mr. Weber to try to call him up and get hold of him.

"Q. Who do you mean by 'they were after him'? A. Everyone on the carpenter work and Weber was after me, and Abbott said finally, you take and go up and see if you can get George to come down; and George said, 'I won't come until I get some money.' I said, 'Come on down and talk to him anyway.' And he said, 'That's what I will do.'

\* \* \* \* \*

"Q. What was said then, if you remember it? A. As I remember it, George demanded three thousand dollars and Mr. Weber told him he couldn't give him that much now, and then they started in talking about the completion. And George says, 'Well, what will I do when it is completed?' And Doctor Weber says, 'I personally myself will pay you.'

\* \* \* \* \*

"Q. Wouldn't Eilertsen have normally come down that morning without you going to get him? A. No, sir, he would not have."

Defendant Vernon F. Weber testified as follows:

"Q. And your associate in this ownership, Doctor Dunn, is a member, I believe, of the medical profession? A. Yes.

"Q. And you occupy this building down there as your office and Doctor Dunn has his office, and then the ground floor is rented out, is it? A. That's right.

"Q. To various mercantile establishments? A. That is correct."

From this evidence we believe the jury could draw these reasonable inferences: (1) That Mr. Abbott, plaintiff's contractor, had failed to pay plaintiff as agreed; (2) That the plaintiff considered the contract with Abbott at an end; (3) That he was justified in refusing to further furnish materials or perform work upon defendants' building; and (4) That the defendants, through Vernon F. Weber, as agent for all defendants, desiring to have the work continue, for the benefit of all defendants, directly promised to pay plaintiff the unpaid portion due him for his labor and materials furnished in the past and the labor and materials to be furnished in the future.

In determining whether or not, under a given state of facts, the agreement constitutes an original or a collateral promise (the words "original" and "collateral" being used by the courts for convenience to distinguish those agreements which come within the terms of the statute, collateral being those that must be in writing, and original those which need not be), the intentions of the parties control, this to be gathered from the words of the promise, the situation of the parties, and all of the circumstances surrounding the transaction. Whether a promise is original or collateral, before there is any delivery of materials or services

by a creditor, may ordinarily be determined by this test: Did the parties understand that the seller was extending credit for the materials or labor on the credit of the party sought to be charged, or to him only as a guarantor of payment should another fail to pay? *McMillan v. Dickover,* 119 Or 116, 117, 248 P 154, and cases cited therein.

■ Where the language used, together with all of the facts and circumstances, is not controverted, the question is one of law as to whether the oral promise was original or collateral. But if there is a doubt created as to whom the credit was extended, then it is a question of fact for the jury to determine. *McMillan v. Dickover,* supra; *Masters v. Bidler,* 101 Or 322, 331, 198 P 912.

■ The jury, by its general verdict, found, under all of the circumstances then existing and the language used, that the agreement of Vernon F. Weber was original and not collateral. And it is apparent to us from the evidence hereinbefore set out that the plaintiff was no longer willing to look to the general contractor Abbott for payment, and, considering the evidence in the light most favorable to the plaintiff, each of the parties understood that the plaintiff was not relying upon the general contractor for the work done subsequent to the promise of the defendant Weber, but was looking to the defendant primarily for payment for the materials and labor furnished subsequent thereto.

Having determined that the promise made was original and not collateral as to the materials and labor furnished subsequent to the promise made by the defendant Weber, there remains this question: Was the promise found to have been made by defendant

Weber collateral as to the materials and labor furnished prior to the promise and under the original contract with the general contractor Abbott? If so, there is no evidence by which the amount due for materials and labor prior to the promise can be segregated from the materials and labor furnished subsequent to the promise; therefore, the verdict of the jury for the full amount of the plaintiff's claim cannot stand.

■ While there is a divergence of views by the courts, Annotations, 99 ALR 79, et seq., the prevailing rule seems to be that a subsequent promisor may be bound by his oral promise to answer for the antecedent debt, default or miscarriage of another when it can be said that there is a direct benefit moving to the promisor; that is, there must be a new and independent consideration for this subsequent promise to withdraw it from the prohibition of the statute, a consideration which is beneficial to the promisor and desired for his personal benefit or some business reason. 2 Williston on Contracts, Rev ed, § 472, p 1358; *Umpqua Valley Bank v. Wilson,* 120 Or 396, 252 P. 563.

As stated in 1 Restatement of the Law, Contracts, § 184, p 244:

"Where the consideration for a promise that all or part of a previously existing duty of a third person to the promisee shall be satisfied is in fact or apparently desired by the promisor mainly for his own pecuniary or business advantage, rather than in order to benefit the third person, the promise is not within Class II of § 178, unless the consideration is merely a premium for the promisor's insurance that the duty shall be discharged.

"Comment: a. The concluding words of the Section exclude from the rule it states contracts of guaranty insurance whether making such contracts is or is not the promisor's regular business.

"Illustrations: 1. D contracts with S to build a house for S. C contracts with D to furnish materials for the purpose. D, in violation of his contract with C fails to pay C for some of the materials furnished. C justifiably refuses to furnish further materials. S orally promises C, that if C will continue to furnish D with materials that C had previously agreed to furnish, S will pay the price not only for the materials already furnished but also for the remaining materials if D fails to do so. S's promise is enforceable."

Based upon this proposition of a new agreement with a real benefit accruing to the promisor, the writers of the Restatement of the Law of Contracts have set forth Illustration 1, supra, and the majority of the courts and textwriters have said, in substance, that "A promise to pay for past and future labor in order that the laborer will continue work which is of direct benefit to the promisor has been held valid in its entirety as not within the statute." 37 CJS 541, Statute of Frauds, § 28, subsection c. See 2 Williston on Contracts, § 481, p 1379; 49 Am Jur 471, Statute of Frauds, § 130.

■ The evidence in this case shows that the defendants were constructing this building to be rented to tenants and to be used by themselves for their professional offices, and that they were anxious to have the building completed for these purposes. They were in fact receiving a direct business benefit, and, therefore, there was sufficient evidence as a foundation for the jury's determination that this was an original obligation of the defendants to pay both for past services rendered and materials furnished and those furnished subsequent to the oral promise.

Nothing stated herein is contrary to the holding of this court in *Mackey v. Smith,* 21 Or 598, 606, 28 P

974, for, while the matter of an oral promise to pay the antecedent debt of another was disallowed by the trial court and the debt subsequent to the oral promise was allowed, the appeal was taken only as to the merchandise furnished subsequent to the oral promise. However, this court, in dicta, recognized the rule of direct benefit, saying:

"If the main purpose of the defendants in making the oral promises to become responsible for the supplies furnished Malone, was to serve their own interest or objects, such oral promises to pay are not within the statute of frauds, although not in writing. The rule, as stated by the authorities, is that where the leading purpose of a person who agrees to pay the debt of another is to gain some advantage or promote some interest or design of his own, and not to become a mere guarantor or surety for another's debt, and the promise is made on sufficient consideration, it will be valid, although not in writing. (Ames v. Foster, 106 Mass. 400; Nelson v. Boynton, 3 Met. 396; Fullman v. Adams, 37 Vt. 391; Clapp v. Webb, 52 Wis. 638; Fitzgerald v. Morrissey, 14 Neb. 198; Clifford v. Luhring, 69 Ill. 401.) But, as the result already reached is decisive of this case, it is not necessary to consider further this phase of the question."

We find no merit in the defendants' contention that the complaint does not state facts sufficient to constitute a cause of action.

Finding no error in the record the judgment is affirmed.