## WASATCH CHEMICAL CO. v. LEON.

No. 7662.    Decided July 6, 1953.    (259 P. 2d 301.)

See 77 C. J. S., Sales, sec. 330. Agent, liability for declarations of, 2 Am. Jur., Agency, sec. 351.

*Samuel J. Nicholes* and *J. D. Hurd,* Salt Lake City, for appellant.

*Glenn C. Hanni* and *R. A. McBroom,* Salt Lake City, for respondent.

McDONOUGH, Justice.

The plaintiff brought action against the defendant for an unpaid bill of $162.82 incurred by the purchase of several gallons of "Wasco General Oil" weed killer. Defendant counterclaimed alleging substantial damage to his onion crop by reason of the use of the Wasco General Oil. The defendant obtained a judgment in a substantial amount, and plaintiff appeals.

Defendant is a farmer who planted a tract of leased land to onions on or about the 1st of April, 1949. On April 23, 1949, defendant approached Dr. Stark concerning a problem of weeds in the onions. Dr. Stark is a trained and experienced horticulturist and plant physiologist retained by plaintiff for the specific purpose of agricultural re-

search and dissemination of information pertaining to the agricultural industry. A certain type of selective weedicide was discussed but defendant told Dr. Stark that the crop could not wait for the application of this type of killer because of the rapid growth of the weeds. Dr. Stark then asked whether defendant's onions had yet emerged from the ground, and upon being told they had not, Dr. Stark recommended the Wasco General Oil as a pre-emergence spray. Defendant was specifically told that this oil would kill all plants, including onions, with which it came in contact but that it would not harm those onions which were underground at the time of application. Defendant, relying upon this representation, purchased the oil and applied it to his field two days later. There is substantial evidence that at the time of application sprouting onions of about 1 inch in height and approximately 1 foot apart had appeared above the surface of the ground. There was also substantial evidence that there was a satisfactory germination of the seeds planted. These facts indicated that the remainder of the onion plants were immediately below the surface of the ground. Expert testimony was introduced to show that under such conditions a general oil weedicide of the Wasco type would kill plants so crowding the earth's surface. Under such evidence and testimony the jury found that the oil was the proximate cause of defendant's loss. The record fully substantiates such findings. Hence only two main questions are raised on appeal: (1) Whether Dr. Stark had the authority to make representations concerning the effect of the weedicide; and (2) Whether such representations constituted express or implied warranties. We will discuss these questions in the order raised.

It is the appellant's contention that since Dr. Stark was not a selling agent of the defendant he had no implied authority to make any warranty or to make any representation concerning the effect of the weed-

icide. However, the question of implied authority of a selling agent is not here involved. The parties stipulated

"that Dr. Arvil L. Stark, at all times material in this case, was the employee of the Wasatch Chemical Co. and was acting in the course and scope of his employment."

As stated in 2 Mechem on Agencies, 2nd Ed., Sec. 1778:

"It is not at all uncommon for the principal to put an agent in a position in which the making of statements or representations or the giving of information is the act expressly contemplated and directed. Thus if the principal refers a person to his agent for information, the agent is clearly authorized to give information for the principal upon the subject indicated. If the principal carrying on an extensive business establishes a bureau of information, or designates an agent to whom inquiries may be referred or of whom information may be obtained, the giving of such information or the answering of such inquiries is an act which the principal has directly authorized.

"The giving of information or the answering of inquiries in such a case must, of course, be confined to the subjects which have actually or apparently been confided to him to answer for; but within that sphere persons expressly or impliedly referred to him, who act in good faith and with reasonable prudence may rely upon the information as information given by the principal."

Under the law as thus stated and the stipulation as recited we can but find that as between these parties, the representations made by Dr. Stark were binding upon the plaintiff providing such representations constituted a warranty of the product so purchased by the defendant.

Contrary to appellant's contention there is no question here as to liability based upon a theory of breach of warranty as to a method of application, as distinguished from a warranty as to the effect of the general oil. There were no representations made as to method of application. The representations were that Wasco General Oil, although destructive to all plant life which it directly contacted, would not destroy those plants beneath the surface of the earth at the time the oil was applied to

plants above such surface. No qualifications were made by plaintiff as to how far beneath the earth's surface the plants must be in order to be safe.

Section 81-1-12, U.C.A., 1943 states:

"Any affirmation of fact or any promise by the seller relating to the goods is an express warranty, if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon."

Section 81-1-15 provides for implied warranty as to quality or fitness for use:

"Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment * * *."

In this case plaintiff, through their authorized employee, represented that onions below the ground surface would not be injured by Wasco General Oil. This was an affirmation of a fact relating to the goods which did induce the buyer to purchase such goods in reliance thereon. Furthermore, the buyer here did expressly make known to the seller the particular purpose for which the weed killer was required, and it is evident from the facts that the buyer relied upon the seller's judgment in selecting such killer. Hence, we conclude as a matter of law that both an express and implied warranty were made by plaintiff in this action and since there was substantial evidence that the great majority of the plants were beneath the surface of the ground when the oil was applied, and substantial evidence from which the jury decided that the proximate cause of destruction was the application of such oil, the only remaining question is whether the defendant acted in a reasonable, prudent manner to minimize his damages.

Against defendant there is testimony to the effect that if the onions did not produce a satisfactory stand within

three or four days after the first plants broke the ground surface, the majority of farmers would plow that crop up and re-plant the field. It was contended that this would be the procedure of an ordinary prudent farmer since such a farmer would know within that period whether continuation of the project was reasonable and prudent under such circumstances.

The testimony in favor of the defendant indicates that he cultivated the crop about two weeks after it had been sprayed. At this time an approximate stand of from forty to fifty per cent of the onions had emerged from the ground and they were in a damaged condition. In regard to this stand, defendant stated that:

"It was just barely enough, if they would have gotten in and started growing, maybe I would have made it worth while to hang on to the crop and break even."

About one week after the cultivation, defendant weeded the onions to eliminate weeds that had germinated subsequent to the application of the oil. He then irrigated and fertilized them twice and then recultivated again toward the latter part of June. He then decided that the onions would not make a marketable crop and they were abandoned. Evidence was also submitted that estimated costs of approximately $2,928 or $2,565.50, depending upon time of marketing, would be incurred subsequent to the abandonment if defendant had elected to raise the crop to maturity. The jury was properly instructed as to defendant's duty to minimize damages.

Under such circumstances we believe the record substantially supports a finding that a very poor stand of onions appeared above the ground; that defendant did believe he might break even if the onions "got in and started growing;" that he continued working with the crop towards that objective until it became apparent that the crop would not be marketable; that upon such discovery it was too late to plow the crop under and plant a new or

different crop; and that defendant's only reasonable and prudent recourse was to abandon the crop and minimize damages by not making any further expenditures thereon. In view of such facts we cannot say that defendant failed in his duty.

The judgment is affirmed. Costs to respondent.

WOLFE, C. J., and CROCKETT and WADE, JJ., concur.

HENRIOD, J., not participating.